# CARIÑO *v.* THE INSULAR GOVERNMENT OF THE PHILIPPINE ISLANDS.

ERROR TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 72. Argued January 13, 1909.—Decided February 23, 1909.

Writ of error is the general, and appeal the exceptional, method of bringing cases to this court. The latter method is in the main confined to equity cases and the former is proper to bring up a judgment of the Supreme Court of the Philippine Islands affirming a judgment of the Court of Land Registration dismissing an application for registration of land.

Although a province may be excepted from the operation of act No. 926 of 1903 of the Philippine Commission which provides for the registration and perfecting of new titles, one who actually owns property in such province is entitled to registration under act No. 496 of 1902, which applies to the whole archipelago.

While, in legal theory and as against foreign nations, sovereignty is absolute; practically it is a question of strength and of varying degree; and it is for a new sovereign to decide how far it will insist upon theoretical relations of the subject to the former sovereign and how far it will recognize actual facts.

The acquisition of the Philippines was not for the purpose of acquiring the lands occupied by the inhabitants, and under the Organic Act of July 1, 1902, c. 1369, 32 Stat. 691, providing that property rights are to be administered for the benefit of the inhabitants, one who actually owned land for many years cannot be deprived of it for failure to comply with certain ceremonies prescribed either by the acts of the Philippine Commission or by Spanish law.

The Organic Act of the Philippines made a bill of rights embodying safeguards of the Constitution, and, like the Constitution, extends those safeguards to all.

Every presumption of ownership is in favor of one actually occupying land for many years, and against the Government which seeks to deprive him of it, for failure to comply with provisions of a subsequently enacted registration act.

Title by prescription against the crown existed under Spanish law in force in the Philippine Islands prior to their acquisition by the United States, and one occupying land in the Province of Benguet for more than fifty years before the Treaty of Paris is entitled to the continued possession thereof.

7 Philippine Rep. 132, reversed.

The facts are stated in the opinion.

*Mr. Frederic R. Coudert* and *Mr. Howard Thayer Kingsbury,* with whom *Mr. D. R. Williams* and *Mr. Charles C. Cohn* were on the brief, for plaintiff in error:

The Land Registration Court had jurisdiction of the subject-matter under act No. 496, §§ 2, 19; and its decision was legal, just and in conformity with the protection of private property provision of the Treaty of Paris. Public Land Act, No. 926. This court has jurisdiction and writ of error is the proper method.

The proceeding is one *in rem* and not *in personam* as it deals with titles to real estate. See § 705, Rev. Stat.; 27 Stat. 434; 31 Stat. 1189, 1227; *Ormsby* v. *Webb,* 134 U. S. 47; *Met. Railroad Co.* v. *Dist. of Columbia,* 195 U. S. 322; *Steinmetz* v. *Allen,* 192 U. S. 543; *Lowry* v. *Allen,* 203 U. S. 476; *Smith* v. *Whitney,* 116 U. S. 167; *Massie* v. *Watts,* 6 Cranch, 148, 158; *Boston Mining Co.* v. *Montana Ore Co.,* 188 U. S. 632, 641; Philippine Code Civ. Pro., Act 190, Phil. Com., § 498.

The land belonged to Cariño under the Igorot law.  He had inherited it from his ancestors in accordance with the native customs and his title had never been questioned.  The Spanish law explicitly recognized and scrupulously protected the Indian titles.  Possession of land under such circumstances confers a property right *jure gentium* independently of any rule of prescription.

Spanish law recognized and protected rights of the native occupants of its Indian possessions even more fully and scrupulously than our Government has done in the case of its Indian wards.  See Arthur Helps, Spanish Conquest in America.

Claimant having actually possessed the land in question for more than thirty years had acquired, under the Spanish Civil Code, good prescriptive title.  The provisions of this Code as to prescription apply to all lands in the Philippine Islands regardless of whether owned by the Government or not, just as they admittedly do in the Spanish Peninsula itself.

The provisions of the Civil Code applied to public agricultural lands as well as to other lands, and a detailed examination of the provisions relating to public lands shows no intention on the part of the Government to except them from the purview of the Code enactments as to prescription, but on the contrary recognize the applicability of the common or general law.  *Valenton* v. *Murciano*, 3 Philippine, 537, to the effect that public agricultural lands were not within the purview of the Code provisions, is unsound, inconsistent with other decisions of that court, and can be distinguished.  Phil. Com. Rep. 1902, Part I, 183; Census of Philippine Islands, 1903, Vol. 1, 533; Phil. Com. Rep. 1904, Pt. I, 574; 1905, Pt. I, 176; "1 Bontoc Igorot," by Albert Ernest Jenks, Ethnological Survey Publication, Interior Dept., Manila, P. I., 1905; *United States* v. *Paine Lumber Co.*, 206 U. S. 467; *Lone Wolf* v. *Hitchcock*, 187 U. S. 564; *Doe* v. *Wilson*, 23 How. 463; "Laws of the Indies," Book 6, Title 1, Law 1; and see in Book 6, Title 1, Laws 15, 23, 27, 30, 32; Book 6, Title 3, Laws 9, 26; Book 2, Title 1, Laws 4, 5; Book 4, Title 1, Laws 6, 8, 10; Book 4,

Title 12, Laws 5, 7, 9, 14, 16, 17, 18, 19; Justinian Code, Book 7, Title 37, c. 1; Book 7, Title 39, c. 4, c. 9; Royal Decree, February 31, 1889; 2 Alcubilla (5th ed.), 692; Third Partida, Title 29, Laws 7, 18, 21.

Translation of the Civil Code in force in Cuba, Porto Rico, and the Philippines, 1893, War Dept. 1899, Arts. 339, 340, 342, 345; and Arts. 1930-6, 1959; *Rosa* v. *Natalio*, 7 Philippine, 556; Francisco Aragon Gonzalez, decided by Supreme Court Spain, April 16, 1881; 46 Jurisprudencia Civil, 9; Madrid, 1882; 3 Sanchez Roman, p. 277, and Alcubilla, 1906, 602; The Sixth Partida, Title 19, Law 10; The Novisima Recopilacion, Book XI, Title 8, Law 4; Ordenanzas Reales de Castilla, Book III, Title 13, L. VI; Bracton, Lib. 2, c. 5, § 7, as cited by Story, J., in *United States* v. *Hoar*, 2 Mason, 311; *S. C.* Fed. Cas. No. 15,373; Pollock & Maitland, Hist. Eng. Law, Vol. I, 572; Vol. II, 144; Statute of 9 Geo. III, 3, c. 16, *Valenton* v. *Murciano*, 3 Philippine, 540; Philippine "Mortgage Law," § 389; Royal Cedula of October 15, 1754; Royal Decree of June 25, 1880, Arts. 4 and 5; "Guia de Compradores de Terrenos Baldios y Realengos de Filipinas," Berriz, 1886, pp. 17–23; Spanish Civil Code, Arts. 348, 467, 1930, 1940, 1952, 1959, *et seq.;* "Land Registration Act" of 1902, § 19, Cl. 1st; Law 1 and Law 2, Title 34, Book II, Novisima Recopilacion; Alcubilla, Vol. 8, p. 776, note 4; Art. X, Const. of Spain, June 30, 1876; Art. VIII, Regulations of 1880.

Cariño had a legal title under the Civil Code. Registration was a mere procedural formality and did not create property. In any event, he had a right of property under Spanish law which was protected by the Treaty of Paris. *Buenaventura* v. *Commanding General*, 6 Philippine, 601; Treaty of Paris; Compilation of Treaties, 1904, 725; *Delassus* v. *United States*, 9 Peters, 133; Act temporarily to provide for the affairs of civil government in Philippine Islands, July, 1902, §§ 12, 14, 16; Public Land Act, No. 926, Comp. Laws and Regulations of Public Lands in Philippine Islands War Dept., Bureau of Insular Affairs, 1908, Chapter VI, § 54; Compilation of Laws and Regulations relating to Public Lands in the Philippine Islands.

Government Ptg. Office, February 1, 1908; 3 Philippine, 543; 6 Philippine, 606; *Strother* v. *Lucas* (1838), 12 Peters, 436; Philippine Code Civ. Pro., § 41; Circular of August 10, published in the Gaceta de Manila, August 11, 1881; Royal Decree of September 24, 1884, Art. 11; Royal Decree of February 13, 1894, Art. 4, § 21.

*The Solicitor General,* with whom *Mr. Paul Charlton* was on the brief, for defendant in error:

The court is without jurisdiction on writ of error. It can only take jurisdiction on appeal. § 10, act of July 1, 1902; 32 Stat. 691. This court can only review actions at law pending in Circuit Courts by writ of error and proceedings in equity only by appeal. The proceedings for the adjudication and registration of titles to lands in the Philippine Islands are in their nature actions in equity rather than actions at law. Act No. 496, Philippine Commission, §§ 2, 14, 16, 21, 35–38, 40. See *Holland* v. *Challen,* 110 U. S. 15; *Clark* v. *Smith,* 13 Pet. 195; *Dower* v. *Richards,* 151 U. S. 658; *Chase* v. *United States,* 155 U. S. 480.

Plaintiff in error possessed no title in the lands at the date of the change of sovereignty from Spain to the United States. During the period of Spanish sovereignty the tribe of Igorots had not been segregated from the body of the Philippine people as to the operation of the general law; no reservation of land was set aside for them, nor did the Spanish Government interfere in their internal tribal affairs. The status of the Igorot in his relation to the Spanish laws is not analogous to that of the American Indian in relation to the laws of the United States, and the cases affecting the tribal rights of Indians have no application to any rights of plaintiff in error, *jure gentium* or otherwise.

Plaintiff's claim of title advanced in the Philippine courts, based mainly upon "prescription" as valid against the Crown of Spain and therefore surviving the change of sovereignty and requiring to be recognized under the Treaty of Paris, is untenable under Spanish law. While that law made ample pro-

·vision for the protection of rights claimed under ancient possession, it was in each case necessary that evidence of title should be submitted to the proper administrative officials. 4 Recopilacion de Leyes de las Indias, law 1, title 12; *Id.*, law 8; *Id.*, law 14; 4 Legislacion Ultramarina, 673; arts. 3, 4, 5; *Id.*, p. 688; Gaceta de Manila, Nov. 15, 1864; Guia del Comprador Terrenos, p. 5; Gaceta de Manila, Sept. 10, 1880; *Id.*, Aug. 11, 1881; *Id.*, April 17, 1894; see also *Valenton* v. *Murciano*, 3 Phil. Rep. 537; *Cansino* v. *Valdez*, 6 Phil. Rep. 320; *Tiglao* v. *Insular Government*, 7 Phil. Rep. 80. · The Spanish law in force when the United States took possession of the Philippines required that all persons claiming title to public lands by prescription should, long prior to that date, have presented and proved their claims, complied with the legal regulations, and secured title by administrative adjudication, upon penalty of becoming mere trespassers and subject to ejectment. Plaintiff in error did not comply with these requirements, the time within which he could have done so had long passed, and he was therefore in the eyes of the law a trespasser on the public lands of the Philippine Islands at the date when the islands passed to the sovereignty of the United States. Under the accepted principles of international law the local laws of Spain applicable to the Philippines, including the mortgage law and the Civil Code, were continued in force by the Government of the United States upon the cession of the islands, so far as they were not incompatible with the fundamental principles of our Government. *American Ins. Co.* v. *Canter*, 1 Pet. 511; *Cross* v. *Harrison*, 16 How. 164; *Leitensdorfer* v. *Webb*, 20 How. 176.

The situation of plaintiff in error has not been changed by legislation of the United States or of the Philippine Islands since the change of sovereignty. The act of March 2, 1901, 31 Stat. 910, continued the status of the public lands until further action by Congress. The organic act of July 1, 1902, empowered the Philippine Government created thereby to promulgate rules and regulations governing the public lands. In pursuance of the powers so conferred, the Philippine Gov-

ernment established a court of land registration and prescribed
such rules and regulations.    Philippine Acts, Nos. 496, 926.
These were, however, suspended as to the Province of Benguet
in which the land in controversy is situated, and for that rea-
son there was no forum in which plaintiff could have legally
established the title he claimed.  Accordingly the court of Land
Registration in attempting to hear and determine his rights
was without jurisdiction.   This land was a military reservation
of the United States, and military and other reservations were
excepted from the provision of the organic act that property
acquired from Spain should be administered for the benefit of
the inhabitants of the Philippines.   Further, in reference to
the sale of public lands to actual occupants or settlers and
others, as in reference to perfecting title to those who prior to
the transfer of sovereignty had fulfilled all or some of the con-
ditions required by the Spanish law for the acquisition of legal
title, yet had failed to secure conveyance of title, there is an
express restriction to an area of 16 hectares, and the tract here
contains 150 hectares.   Sections 12, 16, act of July 1, 1902,
32 Stat. 691, 695, 696.

MR. JUSTICE HOLMES delivered the opinion of the court.

This was an application to the Philippine Court of Land Reg-
istration for the registration of certain land.    The application
was granted by the court on March 4, 1904.  An appeal was
taken to the Court of First Instance of the Province of Benguet,
on behalf of the Government of the Philippines and also on
behalf of the United States, those Governments having taken
possession of the property for public and military purposes.
The Court of First Instance found the facts and dismissed the
application upon grounds of law.   This judgment was affirmed
by the Supreme Court, 7 Philippine, 132, and the case then was
brought here by writ of error.

The material facts found are very few.  The applicant and
plaintiff in error is an Igorot of the Province of Benguet, where
the land lies.  For more than fifty years before the Treaty of

Paris, April 11, 1899, as far back as the findings go, the plaintiff and his ancestors had held the land as owners. His grandfather had lived upon it, and had maintained fences sufficient for the holding of cattle, according to the custom of the country, some of the fences, it seems, having been of much earlier date. His father had cultivated parts and had used parts for pasturing cattle, and he had used it for pasture in his turn. They all had been recognized as owners by the Igorots, and he had inherited or received the land from his father in accordance with Igorot custom. No document of title, however, had issued from the Spanish Crown, and although in 1893–1894, and again in 1896–1897, he made application for one under the royal decrees then in force, nothing seems to have come of it, unless, perhaps, information that lands in Benguet could not be conceded until those to be occupied for a sanatorium, etc., had been designated, a purpose that has been carried out by the Philippine Government and the United States. In 1901 the plaintiff filed a petition, alleging ownership, under the mortgage law, and the lands were registered to him, that process, however, establishing only a possessory title, it is said.

Before we deal with the merits we must dispose of a technical point. The Government has spent some energy in maintaining that this case should have been brought up by appeal and not by writ of error. We are of opinion, however, that the mode adopted was right. The proceeding for registration is likened to bills in equity to quiet title, but it is different in principle. It is a proceeding *in rem* under a statute of the type of the Torrens Act, such as was discussed in *Tyler* v. *Court of Registration*, 175 Massachusetts, 71. It is nearer to law than to equity, and is an assertion of legal title; but we think it unnecessary to put it into either pigeon hole. A writ of error is the general method of bringing cases to this court, an appeal the exception, confined to equity in the main. There is no reason for not applying the general rule to this case. *Ormsby* v. *Webb*, 134 U. S. 47, 65; *Campbell* v. *Porter*, 162 U. S. 478; *Metropolitan R. R. Co.* v. *District of Columbia*, 195 U. S. 322.

Another preliminary matter may as well be disposed of here. It is suggested that even if the applicant have title he cannot have it registered, because the Philippine Commission's Act No. 926, of 1903, excepts the Province of Benguet among others from its operation. But that act deals with the acquisition of new titles by homestead entries, purchase, etc., and the perfecting of titles begun under the Spanish law. The applicant's claim is that he now owns the land and is entitled to registration under the Philippine Commission's Act No. 496, of 1902, which established a court for that purpose with jurisdiction "throughout the Philippine Archipelago," § 2, and authorized in general terms applications to be made by persons claiming to own the legal estate in fee simple, as the applicant does. He is entitled to registration if his claim of ownership can be maintained.

We come then to the question on which the case was decided below, namely, whether the plaintiff owns the land. The position of the Government, shortly stated, is that Spain assumed, asserted and had title to all the land in the Philippines except so far as it saw fit to permit private titles to be acquired; that there was no prescription against the Crown, and that if there was, a decree of June 25, 1880, required registration within a limited time to make the title good; that the plaintiff's land was not registered and therefore became, if it was not always, public land; that the United States succeeded to the title of Spain, and so that the plaintiff has no rights that the Philippine Government is bound to respect.

If we suppose for the moment that the Government's contention is so far correct that the Crown of Spain in form asserted a title to this land at the date of the Treaty of Paris, to which the United States succeeded, it is not to be assumed without argument that the plaintiff's case is at an end. It is true that Spain in its earlier decrees embodied the universal feudal theory that all lands were held from the Crown, and perhaps the general attitude of conquering nations toward people not recognized as entitled to the treatment accorded to those

in the same zone of civilization with themselves. It is true also that in legal theory sovereignty is absolute, and that as against foreign nations, the United States may assert, as Spain asserted, absolute power. But it does not follow that as against the inhabitants of the Philippines the United States asserts that Spain had such power. When theory is left on one side sovereignty is a question of strength and may vary in degree. How far a new sovereign shall insist upon the theoretical relation of the subjects to the head in the past and how far it shall recognize actual facts are matters for it to decide.

The Province of Benguet was inhabited by a tribe that the Solicitor General, in his argument, characterized as a savage tribe that never was brought under the civil or military government of the Spanish Crown. It seems probable, if not certain, that the Spanish officials would not have granted to any one in that province the registration to which formerly the plaintiff was entitled by the Spanish laws, and which would have made his title beyond question good. Whatever may have been the technical position of Spain, it does not follow that, in the view of the United States, he had lost all rights and was a mere trespasser when the present Government seized his land. The argument to that effect seems to amount to a denial of native titles throughout an important part of the island of Luzon, at least, for the want of ceremonies which the Spaniards would not have permitted and had not the power to enforce.

The acquisition of the Philippines was not like the settlement of the white race in the United States. Whatever consideration may have been shown to the North American Indians, the dominant purpose of the whites in America was to occupy the land. It is obvious that, however stated, the reason for our taking over the Philippines was different. No one, we suppose, would deny that, so far as consistent with paramount necessities, our first object in the internal administration of the islands is to do justice to the natives, not to exploit their country for private gain. By the organic act of July 1, 1902, c. 1369, § 12, 32 Stat. 691, all the property and rights acquired there by the

United States are to be administered "for the benefit of the inhabitants thereof." It is reasonable to suppose that the attitude thus assumed by the United States with regard to what was unquestionably its own is also its attitude in deciding what it will claim for its own. The same statute made a bill of rights embodying the safeguards of the Constitution, and, like the Constitution, extends those safeguards to all. It provides that "no law shall be enacted in said islands which shall deprive any person of life, liberty, or property without due process of law, or deny to any person therein the equal protection of the laws." § 5. In the light of the declaration that we have quoted from § 12, it is hard to believe that the United States was ready to declare in the next breath that "any person" did not embrace the inhabitants of Benguet, or that it meant by "property" only that which had become such by ceremonies of which presumably a large part of the inhabitants never had heard, and that it proposed to treat as public land what they, by native custom and by long association, one of the profoundest factors in human thought, regarded as their own.

It is true that by § 14 the Government of the Philippines is empowered to enact rules and prescribe terms for perfecting titles to public lands where some but not all Spanish conditions had been fulfilled, and to issue patents to natives for not more than sixteen hectares of public lands actually occupied by the native or his ancestors before August 13, 1898. But this section perhaps might be satisfied if confined to cases where the occupation was of land admitted to be public land and had not continued for such a length of time and under such circumstances as to give rise to the understanding that the occupants were owners at that date. We hesitate to suppose that it was intended to declare every native who had not a paper title a trespasser and to set the claims of all the wilder tribes afloat. It is true again that there is excepted from the provision that we have quoted as to the administration of the property and rights acquired by the United States, such land and property as shall be designated by the President for military or other reser-

vations, as this land since has been. But there still remains the question what property and rights the United States asserted itself to have acquired.

Whatever the law upon these points may be, and we mean to go no further than the necessities of decision demand, every presumption is and ought to be against the Government in a case like the present. It might, perhaps, be proper and sufficient to say that when, as far back as testimony or memory goes, the land has been held by individuals under a claim of private ownership, it will be presumed to have been held in the same way from before the Spanish conquest, and never to have been public land. Certainly in a case like this if there is doubt or ambiguity in the Spanish law we ought to give the applicant the benefit of the doubt. Whether justice to the natives and the import of the organic act ought not to carry us beyond a subtle examination of ancient texts, or perhaps even beyond the attitude of Spanish law, humane though it was, it is unnecessary to decide. If, in a tacit way, it was assumed that the wild tribes of the Philippines were to be dealt with as the power and inclination of the conqueror might dictate, Congress has not yet sanctioned the same course as the proper one " for the benefit of the inhabitants thereof."

If the applicant's case is to be tried by the law of Spain we do not discover such clear proof that it was bad by that law as to satisfy us that he does not own the land. To begin with, the older decrees and laws cited by the counsel for the plaintiff in error seem to indicate pretty clearly that the natives were recognized as owning some lands, irrespective of any royal grant. In other words, Spain did not assume to convert all the native inhabitants of the Philippines into trespassers or even into tenants at will. For instance, Book 4, Title 12, Law 14 of the Recopilacion de Leyes de las Indias, cited for a contrary conclusion in *Valenton* v. *Murciano*, 3 Philippine, 537, while it commands viceroys and others, when it seems proper, to call for the exhibition of grants, directs them to confirm those who hold by good grants or *justa prescripcion*. It is true that it

begins by the characteristic assertion of feudal overlordship and the origin of all titles in the king or his predecessors. That was theory and discourse. The fact was that titles were admitted to exist that owed nothing to the powers of Spain beyond this recognition in their books.

Prescription is mentioned again in the royal cedula of October 15, 1754, cited in 3 Philippine, 546: "Where such possessors shall not be able to produce title deeds it shall be sufficient if they shall show that ancient possession, as a valid title by prescription." It may be that this means possession from before 1700, but at all events the principle is admitted. As prescription, even against crown lands, was recognized by the laws of Spain, we see no sufficient reason for hesitating to admit that it was recognized in the Philippines in regard to lands over which Spain had only a paper sovereignty.

The question comes however on the decree of June 25, 1880, for the adjustment of royal lands wrongfully occupied by private individuals in the Philippine Islands. This begins with the usual theoretic assertion that for private ownership there must have been a grant by competent authority, but instantly descends to fact by providing that for all legal effects those who have been in possession for certain times shall be deemed owners. For cultivated land, twenty years uninterrupted is enough. For uncultivated, thirty. Art. 5. So that when this decree went into effect the applicant's father was owner of the land by the very terms of the decree. But it is said, the object of this law was to require the adjustment or registration proceedings that it described, and in that way to require every one to get a document of title or lose his land. That purpose may have been entertained; but it does not appear clearly to have been applicable to all. The regulations purport to have been made "for the adjustment of royal lands wrongfully occupied by private individuals." (We follow the translation in the Government's brief.) It does not appear that this land ever was royal land or wrongfully occupied. In art. 6 it is provided that "interested parties, not included within the two preceding

articles [the articles recognizing prescription of twenty and
thirty years] may legalize their possession, and thereby acquire
the full ownership of the said lands, by means of adjustment
proceedings, to be conducted in the following manner." This
seems by its very terms not to apply to those declared already
to be owners by lapse of time. Article 8 provides for the case
of parties not asking an adjustment of the lands of which they
are unlawfully enjoying the possession, within one year, and
threatens that the treasury "will reassert the ownership of the
State over the lands," and will sell at auction such part as it
does not reserve. The applicant's possession was not unlawful
and no attempt at any such proceedings against him or his
father ever was made. Finally, it should be noted that the
natural construction of the decree is confirmed by the report
of the Council of State. That report puts forward as a reason
for the regulations that, in view of the condition of almost all
property in the Philippines, it is important to fix its status by
general rules on the principle that the lapse of a fixed period
legalizes completely all possession; recommends in two articles
twenty and thirty years, as adopted in the decree; and then
suggests that interested parties not included in those articles
may legalize their possession and acquire ownership by adjust-
ment at a certain price.

It is true that the language of arts. 4 and 5 attributes title to
those "who may prove" possession for the necesssary time,
and we do not overlook the argument that this means may prove
in registration proceedings. It may be that an English con-
veyancer would have recommended an application under the
foregoing decree, but certainly it was not calculated to convey
to the mind of an Igorot chief the notion that ancient family
possessions were in danger, if he had read every word of it.
The words "may prove," (*acrediten*), as well, or better, in view
of the other provisions, might be taken to mean when called
upon to do so in any litigation. There are indications that
registration was expected from all, but none sufficient to show
that for want of it ownership actually gained would be lost.

The effect of the proof wherever made was not to confer title, but simply to establish it, as already conferred by the decree, if not by earlier law.   The royal decree of February 13, 1894, declaring forfeited titles that were capable of adjustment under the decree of 1880, for which adjustment had not been sought should not be construed as a confiscation, but as the withdrawal of a privilege.   As a matter of fact, the applicant never was disturbed.   This same decree is quoted by the Court of Land Registration for another recognition of the common law prescription of thirty years as still running against alienable crown land.

It will be perceived that the rights of the applicant under the Spanish law present a problem not without difficulties for courts of a different legal tradition.   We have deemed it proper on that account to notice the possible effect of the change of sovereignty and the act of Congress establishing the fundamental principles now to be observed.   Upon a consideration of the whole case we are of opinion that law and justice require that the applicant should be granted what he seeks, and should not be deprived of what, by the practice and belief of those among whom he lived, was his property, through a refined interpretation of an almost forgotten law of Spain.

*Judgment reversed.*