UNITED STATES v. FULLARD-LEO et al.

Clv. No. 417.

District Court, Hawaii.

Dec. 23, 1940.

See, also, 66 F.Supp. 782.

Ingram M. Stainback, U.S. Atty., and John E. Parks, Asst. U.S. Atty., both of Honolulu, T. H., for the United States.

Robertson, Castle & Anthony, of Honolulu, T. H., for Fullard-Leos.

Smith, Wild, Beebe & Cades, of Honolulu, T. H., for Coopers and other interests.

METZGER, District Judge.

This cause, entitled "An Action to Quiet Title", was tried by the Court, jury waived.

### Evidence, Facts, Discussions and Findings

Palmyra Island lies about one thousand miles in a southerly direction from Honolulu and is a coral covered atoll comprising fifty or more islets, many of which are covered with trees and tropical vegetation, surrounding three deep-water lagoons. Its early history is of no importance here, beyond the fact that the island remained unannexed by any nation until 1862.

In the early part of 1862 Johnson Wilkinson and Zenas Bent, citizens of the Kingdom of Hawaii, made a "representation" concerning Palmyra Island to the King (Kamehameha IV), or the Kingdom of Hawaii, as shown by the minutes of a meeting of the Cabinet Council held at the Palace at Honolulu on February 26, 1862, at which meeting the King presided, with Ministers Prince Kamehameha, Chief Justice Allen, Mr. Gregg and Mr. Wyllie present. These minutes, preserved in a bound volume in the Public Archives of the Territory, were exhibited to the Court by the archivist and a photostatic copy put in evidence. Full extent of the representation made by Wilkinson and Bent are not known, but an authenticated transcript of the minutes, prepared by the archivist, reads as follows, in reference to the subject of the island:

\* \* \* \* \* \*

"P. Kamehameha read a Representation from Z. Bent & Mr. Wilkinson, about the Island Palmyra, requesting that the Island should be considered a Hawaiian possession & be placed under the Hawaiian Flag.

"After some discussion it pleased the King to direct the Minister of the Interior, to grant what the Petitioners apply for, following the precedent of the Resolution regarding the Island Cornwallis & without exceeding the same."

The following day February 27, 1862, the Pacific Commercial Advertiser at Honolulu, printed an article reading in part as follows:

"Expedition.—The sloop Louisa has been purchased by J. Wilkinson, and is now being fitted for a southern expedition, under command of Captain Zenas Bent. We understand she will take possession of an island during her cruise. \* \* \*"

On March 1, 1862, Prince Lot Kamehameha, Minister of the Interior, addressed a letter to Messrs. J. Wilkinson and Zenas Bent, as follows:

"Interior Office
Honolulu, March 1, 1862.
Gentlemen:

I am instructed by his Majesty's government to acknowledge the receipt of your petition of the 24th Ult. and to inform you that in Cabinet Council held on the 27th ult. at the Palace, the above mentioned memorial was considered and discussed; and I am authorized to State on the part of his Majesty's government that they consent to the taking possession of the island of Palmyra, situated in longitude 161° 53 West and in latitude 6°4 North as described by you in said memorial; for the purpose of increasing the trade and Commerce of this Kingdom, as well as offering protection to the interests of its subjects—

I have the honor to forward with this dispatch the Authority under the Royal Sign Manuel to Zenas Bent, Esq. to take possession of the above mentioned island of Palmyra, and I beg to request that you will after having executed the orders contained in the Commission, you will report the fact to this Department—

Hoping that the enterprise may prove Successful, I beg to remain

Gentlemen
Your Obt. Servt.
L. Kamehameha"

The commission referred to was put in evidence, and reads as follows:

"Kamehameha IV, By the Grace of God, of the Hawaiian Islands, King:

To All whom it May Concern Greeting: Know Ye, that We, have authorized and empowered our faithful Subject Zenas Bent and by these presents, do hereby empower the said Zenas Bent to take possession in our name of Palmyra Island—the said island being situated in longitude 161° 53 West and in latitude 6°4 North, not having been taken possession of by any other government or any other people, by erecting thereon a short pole, with the Hawaiian flag wrapped around it and interring at the foot thereof a bottle well corked containing a paper signed by him in the following form, viz:

'Visited and taken possession of by order of His Majesty King Kamehameha IV, for him and his successors on the Hawaiian throne, by the undersigned in the Schooner "Louisa" this ——— day of ——— 186-.'

In witness whereof, We have hereunto set our hand, conjointly with our Kuhins Nui, and Caused the Great Seal of the Kingdom to be affixed, this 1st day of March, A.D. 1862.

                                        Kamehameha
Kaahumanu
            By command of the King and
                the Kuhina Nui
                L. Kamehameha"

Under date of June 16, 1862, Zenas Bent made the following report of his doings, as shown by a copy of a document on file in the Interior Department Lands file in the Public Archives of the Territory, which was put in evidence.

            "In re. Palmyra Island.

To His Royal Highness Prince L. Kamehameha, Minister of the Interior.

Sir: In pursuance of the authority granted to me by His Majesty Kamehameha IV., on the first day of March A. D. 1862, I took possession of Palmyra Island, in the name of His Majesty; and according to my instructions, I erected on the island a pole, with the Hawaiian flag wrapped round it; and I interred at the foot of it a bottle

well corked, containing a paper signed by me, in·the following form:

'This island is taken possession of by order of His Majesty King Kamehameha IV., for him and his successors on the Hawaiian throne, by the undersigned, in the schooner Louisa, this 15th day of April A. D. 1862.
        (signed)                Zenas Bent'

By correct observation, I found the island to be in latitude 5° 50′ North, and in longitude 161° 53′ West.

The island is about ten miles in length and six miles in breadth. The eastern end rises about twenty feet above the level of the sea. The landing is on the west end; and a vessel can lie in perfect safety in three fathoms of water.

The trees on the island are cocoanut, puhala and a species of the koa.

All kinds of vegetables will grow on the island. I planted some beans, corn and watermelons.

I erected a dwelling house on the island, and also a curing house for biche de mer.

I left on the island one white man and four Hawaiians, who are engaged in curing the biche de mer.

I propose returning to the island in about ten days.

I have the honor to remain
                Your obedient servant,
                    Z Bent"
June 16, 1862.

Thereafter there was published in the Polynesian, the Government's Gazette, the following proclamation as shown by printed notice on file in the Interior Department Lands file of the Public Archives put in evidence.

            "By Authority.

            Proclamation!

Whereas, On the 15th day of April 1862, Palmyra Island, in latitude 5°50′ North, and longitude 161° 53′ West, was taken possession of, with the usual formalities, by Captain Zenas Bent, he being duly authorized to do so, in the name of Kamehameha IV., King of the Hawaiian Islands. Therefore, This is to give notice, that the said island, so taken possession of, is henceforth to be considered and respected as part

of the Domain of the King of the Hawaiian Islands.

L. Kamehameha,
Minister of Interior.

Department of the Interior, June 18, 1862."

The Polynesian on June 14, 1862, published the following:

"Memoranda

The sloop Louisa, Capt Bent, sailed hence March 28, and arrived at Palmyra Island on the 6th April, having had pleasant weather on the passage down, with moderate winds from the southward of East. Left again May 17 and touched at Washington Island on the 24th, having had light westerly winds between the two. The first eight days from Washington Island had light northerly winds, with frequent rain squalls; and then had the wind from NE to NNE to within 200 miles of port. Was 10 days from lat 4°40'N to 10° N. Capt. Bent wishes particularly to call attention to the fact, that in long 158° to 160° W, and lat 4° to 9°N, he found a westerly current of 20 knots in 24 hours—He has been over the same locality every few months during the last five years, but always found an easterly current. During this last crossing he was almost entirely becalmed the greater portion of the time, and the rain was much heavier than he ever before experienced. A tub 16 inches deep, left standing on the deck was completely filled four times during one watch."

On August 27, 1885, an instrument was recorded in the Registry of Conveyances of the Kingdom at Honolulu, showing that a copartnership which had existed between Wilkinson and Bent was terminated on December 24, 1862, on which date Bent sold and conveyed to Wilkinson all of his interest in Palmyra. The pertinent part of the instrument reads as follows:

\* \* \* \* \* \*

"Know all men by these presents that I, Zenas Bent of Honolulu, Oahu, Hawaiian Islands, in consideraton of Five hundred Dollars to me paid by Johnson Wilkinson of Honolulu aforesaid, the receipt of which is hereby acknowledged do hereby give, grant, bargain, sell and convey unto the said Johnson Wilkinson his representatives and assigns, All my right title and interest in and to all the property of whatever description now lying or situated on Palmyra Island in the Pacific Ocean which Island by a proclamation of His Majesty Kamehameha IV at present belongs to the Hawaiian Kingdom. And also all my right, title and interest in and to any partnership property that I may have an interest in as Copartner with the said Johnson Wilkinson. To have and to hold the same with all the rights, privileges and appurtenances to the same belonging unto the said Johnson Wilkinson his representatives and assigns. In witness whereof, I have hereunto set my hand and seal this Twenty-fourth day of December A. D. Eighteen hundred and sixty-two.

In the presence of J. W. Austin

Zenas Bent"

Johnson Wilkinson died in New Zealand, where he had taken up residence, in June, 1866, after having made his will in which he wrote, "I give, devise and bequeath to my wife, Kalama, all \* \* \* (personality mentioned) And also all my landed freehold and leasehold estates in the Province of Auckland aforesaid, at Honolulu in the Sandwich Islands, and the Island of Palmyra in the South Sea Islands and wheresoever the same may be situated and whether in the said Colony of New Zealand or elsewhere. To hold such real and personal estate unto the said Kalama, absolutely and forever." This will was proved and registered and administration of the estate made under authority of the Supreme Court at Auckland, New Zealand.

Kalama, the widow of Wilkinson, was a Hawaiian. She returned to Hawaii after her widowhood and is said to have remarried two or more times, leaving at the time of her death, intestate, several heirs who claimed her estate. Her last husband, H. Kahaawinui, and her brother, J. Kaikala, sold and conveyed in June, 1885, to W. L. Wilcox of Honolulu, for $550, all of their right and title as heirs at law of Kalama in the Island of Palmyra. The following month Wilcox sold and conveyed all his right, title and interest in the island to Pacific Navigation Company, a Hawaiian corporation. The Pacific Navigation Company

did not prosper in business and, in December, 1887, conveyed by deed of trust to W. F. Allen, for the benefit of its creditors, "all lands, tenements and hereditaments", together with all its other property. Allen, as trustee, sold and conveyed to W. A. Kinney in January, 1888, for a stated consideration of $750, all the right, title and interest he had acquired in the island by reason of the trust deed. In March, 1890, Kinney remised and quitclaimed forever the island to F. W. Wundenberg for a consideration of $500. During Wundenberg's holding under the deed of Kinney, Ancillary Administration under Johnson Wilkinson's will was brought to Hawaii and on November 1st, 1898, the will was admitted to probate in the First Circuit Court and Letters of Administration issued. Elsie M. Wundenberg, as widow and sole devisee of F. W. Wundenberg, deceased, quitclaimed the island to Henry E. Cooper on June 12, 1911. The following April, Cooper filed a petition in the Land Court of the Territory praying for confirmation and registration of his title, claiming ownership in fee simple. Among others, the Territory of Hawaii was named and summoned as a party respondent in the Land Court proceedings, and on July 1, 1912, the Territorial Attorney General's office filed a disclaimer of any interest in, to, or concerning the lands or premises. Pending hearing on his petition for registration of title, Cooper purchased for $501, at a public judicial sale the interest and title of certain minors acquired from their deceased father, William Ringer, who had purchased the interest of Kauhaikane, one of the brothers of Kalama. Cooper also purchased for $150 the right of dower interest in the island of Annie Ringer, widow of William Ringer. A decree declaring Henry E. Cooper to be the owner in fee simple was rendered and filed in the Land Court on October 4th, 1912. Thereafter the only fee title transfer shown was from Cooper to Leslie and Ellen Fullard-Leo of a major portion of the island, in August, 1922, for the consideration of $15,000.

No record of taxation of this land was shown in evidence until the year 1885, when assessment at a valuation of $1,000 for the real property was made against the then owner of record, Pacific Navigation Company, such assessment was also made during the years 1886 and 1887. No further taxes were shown to have been assessed or paid until after Henry E. Cooper became the owner of record in 1911. It appears from the consideration named in earlier deeds that the value of the island was considered to be only a few hundred dollars, and it appears from evidence of Territorial tax office expert, Campbell Crozier, that the rate on real property was small in those days, only one-half of one per centum of assessed value, and, if real property return were not made by the owner, it was likely to be overlooked altogether. Assessments have been made annually by the Territory since 1911 and there has been paid by the Cooper interest more than $1,000 in taxes to the Territory. Taxes have likewise been assessed against the Fullard-Leos upon about ninety per centum of the island since their purchase in 1922.

Certain of the instruments relating to Palmyra Island are set forth in full herein, or quoted from at length, for the reason that their words are considered by the petitioner to be of controlling importance, and the petitioner and respondents present diverse views as to their intent, meaning and effect.

The theory of the petitioner is that when Palmyra was annexed in 1862 it became the fee simple property of the King, or Kingdom, of Hawaii; that it so remained until it passed to the Provisional government in 1893, thence to the Republic of Hawaii in 1894, and finally to the United States by reason of the cession treaty and the Resolution of Annexation of Congress in 1898.

The petitioner maintains that its theory is conclusively proved by the King's direction at the Cabinet Council meeting that the annexation of Palmyra Island should follow the precedent of the "Resolution regarding Cornwallis Island and without exceeding the same"; that this could mean but one thing, namely, that the King took the title and granted a five year lease to Wilkinson and Bent as had been done with Cornwallis to E. P. Adams.

Relative to Cornwallis Island, it is shown that the same day, May 31, 1858, that a commission was issued to Samuel C. Allen

to go forth and take possession of any unpossessed island or islands he might find in the North Pacific, the Minister of the Interior entered into an agreement giving one E. P. Adams "the exclusive right for five years to take guano and other produce which may be found on any island or islands in the North Pacific Ocean taken possession of in the name of His Majesty, King Kamehameha IV, by Samuel Clesson Allen in the schooner 'Kalama' ", upon condition that Adams pay the Interior Department one-eighth of the net proceeds of all profits derived from said island or islands. This contract was rescinded by the Minister of Interior, as to Cornwallis Island, shortly thereafter when it was discovered that that island had been annexed by the United States prior to the time when Allen arrived there on June 14, 1858, and performed the ceremonies of annexion giving it the name Cornwallis Island. The King had nothing upon which to base a lease or grant before the acquisition of some island, and there is no record that, following the annexation of Cornwallis, the first island taken by Allen, the King or Government ever confirmed or ratified a five year grant to Adams, no more than can a record be produced showing that the King later confirmed any grant or title to Wilkinson and Bent in Palmyra. Evidence showed that many records are incomplete, or, that many things were done in those days without making records.

The written request of E. P. Adams of May 24, 1858, makes it clear that he claimed no proprietorship, occupation, or even knowledge, except upon information and belief, of any North Pacific island. He asserted that he believed some of them obtained large deposits of guano and asked that he be permitted to take possession in the name of the Hawaiian Government of any that were not in the possession of any other government and that he be granted a seven-eighth interest in any so taken possession of by him, with an exclusive right to conduct all business connected with them. The government did not signify a willingness to grant this request in whole, but a few days later commissioned Samuel C. Allen, referred to as "our faithful Subject", and not E. P. Adams, to take possession by order of His Majesty, King Kamehameha

IV. What, if any, agreement existed between the Kingdom and S. C. Allen is not shown, but it appears quite plain in this instance that the intention was that the fee simple title to islands annexed through Allen's aid, in the Schooner "Kalama", was to vest in the King. If there existed any relationship between Allen and Adams it was not shown.

It appears from a letter that Lot Kamehameha, Minister of Interior, wrote to Adams on October 16, 1858, that the government was embarrassed when it learned that the Island Cornwallis (later known as Johnston Island) taken under Allen's commission, had already been annexed by the United States. It is not improbable that whatever chagrin was felt by the King and his Cabinet of Ministers was due to the repudiation of proclaimed sovereignty by the King and not from the loss of the land, a thing of small value at that time. It is reasonable to suppose that in discussing the authorization of a commission to Bent for the annexation of Palmyra the Cabinet Council desired that he be specially directed to not exceed the authority which in the commission to Allen four years earlier had been limited to islands that were "not in possession of any other government or any other people." It was quite conceivable that upon Bent's return to Palmyra he might find that it has already been taken possession of by another nation.

The words used in the formality of annexation and proclamation need not and likely would not have been different whether it was the intention that the act of annexion should constitute the vesting of a fee simple title to the lands in the King, or merely extend sovereignty over the domain annexed.

The petitioner argues there is no evidence that Bent and Wilkinson occupied or held possession of Palmyra, or had ever been upon the Island, prior to the time they petitioned for its annexation, and that it would have made no difference had they then been in possession or occupancy for, under principles established by the Law of Nations, they could have gained no title by occupancy or possession and, upon annexion, the fee simple title would neces-

sarily become vested in the annexing Sovereign. To sustain this view, petitioner's counsel cites eminent and ancient authority to the effect that when fresh discovery of land is made and possession taken of it under authority of an existing government, it is considered that the discovery is made for the benefit of the whole nation and that the title in the newly discovered land vests in the nation to which its discoverers were citizens.

The respondents showed some evidence that Bent and Wilkinson were publicly and officially reported to have been in occupancy of Palmyra since the late 50's and that Bent, at least, traveled frequently in that vicinity and was for some years prior to 1862 familiar with the currents, winds, and climate in that vicinity, and they claim that the King could have, and did, recognize their claim of ownership, and intended and did, in fact, by the resolution and the proclamation of annexation merely extend the sovereignty of the Kingdom over the Island, with the design as stated in the letter of the Minister of the Interior transmitting the commission to Bent: "for the purpose of increasing the trade and Commerce of the Kingdom as well as offering protection to the interests of its subjects".

It is not shown that the Kingdom of Hawaii had any law, fixed plan or definite design relating to the annexation of distant islands, or with respect to title to lands embraced in those annexed; every such matter and proposition came before the King and Council for their consideration and determination.

There is nothing inherent in the Law of Nations that requires the vesting of title to lands in the government or King when sovereignty is extended over new domain. Such a thing would often be impossible. The United States fixed by a statute its terms for annexing guano islands. The Kingdom of Hawaii fixed its terms by the will of the King, with approval of the Kuhina Nui, after conference with its Cabinet of Ministers.

It can scarcely be doubted that the King had power to prescribe the terms under which annexion should be made and the right, under the Law of Nations, to take absolute title, had he so desired, for title could not have become vested in Wilkinson and Bent prior to that time, but he likewise had power to recognize and assent to whatever representation or claim, if any, inchoate title, possession or right, Bent and Wilkinson may have made, and authorize the bringing of this island under the flag of his Kingdom for the purpose of giving his subjects and their holdings, whatever they may have been, or were considered to be, at the time, the protection and benefits of Hawaiian Laws, and incidentally acquiring for his Kingdom possible future benefits arising from taxation and enlarged commerce. No cogent proof is shown on either side of the question of prior occupation or possession. What slight evidence there is leans in favor of the claim by respondents, and petitioner has in no manner overthrown it. Following the annexion Bent and Wilkinson made representations to the government and the public that they had improved the island by various plantings and had erected buildings there and rather extensively engaged in gathering, curing and shipping beche de mer, a sea slug. Apparently all of their operations were at their own expense, and there is no evidence, that they ever considered it necessary or appropriate to procure any permission from the King or officers of the Kingdom for their occupancy or acts, or paid or became indebted for any rental, royalty, or share to the King or Kingdom. This is indicative that they claimed this right and that the King recognized a proprietorship in them.

It is probable that the King was influenced more by his ideas of natural law and promptings of natural justice, than by whatever knowledge he may have possessed of international law. Under the Constitution then in force, he was the supreme Executive Magistrate; "The Kingdom is His". Article 1 of the Constitution declared: "God hath created all men free and equal; and endowed them with certain inalienable rights; among which are life and liberty, the right of acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness." And Article 15 provided: "Each member of society has a right to be protected by it

in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his proportional share to the expense of this protection; to give his personal services, or an equivalent, when necessary; but no part of the property of any individual, can, with justice, be taken from him or applied to public uses without his own consent, or that of the King, the Nobles, and the Representatives of the people. And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."

The Court was asked by the petitioner during the trial to take judicial notice of certain historical facts and public documents concerning Hawaii, and specifically documents relating to its Annexation, among which mentioned was, "U. S. Senate Document 16, 55th Congress, 3rd Session. Message of the President of the United States transmitting the Report of the Hawaiian Commission in pursuance of the Joint Resolution to provide for annexing the Hawaiian Islands to the United States," etc., of December 6th, 1898. In this document an itemized inventory of all government property is given by departments, detailing minutiae items of property down to separate pieces of office furniture, and all known government lands and interest in lands of every kind, size and description are listed and valued, under the Interior Department. Palmyra Island is named elsewhere in this document as being a part of the Hawaiian group, but is not at any place listed as government property. With respect to government land, the report contains the following statement:

"The Public Domain.—The statistics available in regard to the public lands belonging to the Republic of Hawaii at the time of the cession to the United States are not of that absolute or definite character that they can be accepted as conclusive of areas and values.

"The frequent radical changes in the past years in the methods of control and of sales and leases and transfers of lands under the direction of the Crown—some made by royal order or grant, some by law, and some without much legality or formality—have made it very difficult to arrive at exact figures. We have, however, from the best sources available, obtained the following statements, which are approximately correct, but subject to amendment when full opportunity may present for critical examination and computation."

Palmyra Island is not named in any statement of public lands that preceded, or any amended statement following, the above report and inventory.

Evidence showed that extensive and exhaustive search has been made to ascertain if Palmyra Island was ever publicly designated, classified, or known as Crown land or public domain, during or after the time of the Monarchy. Nothing of the kind can be found. This creates an implication that the lands were never considered public.

Seventy eight years have run since the King and his Cabinet discussed and granted Wilkinson and Bent's request to bring Palmyra under the Hawaiian flag as a part of the Domain of the Kingdom of Hawaii. All of the actors have long since passed on, and but fragmentary records remain to show the things that then transpired, or indicate the full purpose and intent of those shown.

Unless it can be found in the Commission and Proclamation of Annexation, there is no evidence that the King ever claimed any title in the lands of Palmyra Island, and whatever weight there may be in such proof or presumption, is overthrown by evidence that Wilkinson and Bent and their successors consistently claimed without challenge and exercised full ownership, and there is no evidence that the King or his successors, or the Provisional Government, the Republic, the United States, or its agent under the Organic Act, the Territory of Hawaii, to whom it intrusted the possession, use, control and management of all ceded property, ever made any claim of title or exercised any dominion, other than that of sovereignty protection, over the island down until near the time this suit was brought. On the other hand there is evidence that both the Kingdom and the United States through numerous departments, agents and officers, regarded the

island as privately owned and dealt with various owners of record on that basis.

The corporate person with whom the United States made its treaty of annexation and from whom it took its title to property and rights appertaining thereto, was the Republic of Hawaii. It cannot now come in and say that the P. G. Government was entitled under certain principles of law to have received more from the Crown than its record's show it got or claimed, or complain that the Republic was entitled to receive more than it got from the Provisional Government and more than that government or the Republic ever claimed to own.

■ While it is fairly well settled law, based upon many sound reasons, that time or prescription does not run against a sovereign, it is also settled law that a sovereign is subject to the same legal presumptions and is required to make the same degree of proof as would an individual in prosecuting a claim for title in land. Justice Holmes said in the case of Carino v. Insular Government of the Philippine Islands, 212 U.S. 449, 29 S.Ct. 334, 336, 53 L.Ed. 594, in which the United States was an intervenor, having taken possession of part of the land for military purposes, a case involving title claim by the United States similar in many legal aspects and character to this case: "Every presumption is and ought to be against the government in a case like the present."

The respondents presented several grounds of defense which would come into play if it were shown that the Republic of Hawaii had claimed any land title to the island and had purported to convey any such title to the United States by its cession. Some of these defenses I consider sound and sufficient, but they need not be discussed here.

Due to novel features arising in the case and public interest manifested, as well as admiration of the industry and able and elaborate argument of counsel, I have devoted more time and space in writing the decision in the case, then is justified by its intrinsic difficulties.

■ My controlling find is, that the sovereignty of the United States was extended over Palmyra Island by Annexation, but the Republic of Hawaii did not in fact or in form assert fee simple title to this land at the time of annexation, or at any other time, and it is sufficient to say, only, as a

## Conclusion

I am decidedly of opinion that petitioner does not exhibit a title which can be sustained in the Courts of the United States and, therefore, is not entitled to any relief prayed for.

The petition is dismissed, and judgment for respondents will be entered upon presentation of an approvable form.