**UNITED STATES v. FULLARD–LEO et al.**
**No. 9889.**

Circuit Court of Appeals, Ninth Circuit.
Feb. 1, 1943.

As Amended March 4, 1943.

Norman M. Littell, Asst. Atty. Gen., Angus M. Taylor, Jr., U. S. Atty., of Honolulu, T. H., and Robert P. Marquis and Vernon L. Wilkinson, Attys., Department of Justice, both of Washington, D. C. for appellant.

A. G. M. Robertson, of Honolulu, T. H. (Robertson, Castle & Anthony, of Honolulu, T. H., of counsel), for appellees Leslie Fullard-Leo and Ellen Fullard-Leo.

E. H. Beebe of Honolulu, T. H. (Smith, Wild, Beebe & Cades, of Honolulu, T. H., of counsel), for appellees Cooper et al.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

Appeal was taken from a judgment dismissing an action brought by appellant to quiet title to Palmyra Island.

Palmyra Island is an atoll comprising some 52 islets surrounding three deep-water lagoons, and is situated about 900 miles south of Honolulu. Many of the islets are covered with trees and tropical vegetation. It was discovered by Captain Sawle of the American ship Palmyra on November 6, 1802.

There was evidence, excluded by the court below, that one G. P. Judd, on October 19, 1859, visited the island and left "a bottle containing notice of taking possession".

Prior to February 26, 1862, Wilkinson and Bent, naturalized citizens of the Kingdom of Hawaii, made a "representation to the Kingdom. The "representation" itself cannot be found. The minutes of a meeting of the Cabinet Council on February 26, 1862, contain the following:

" 'P. Kamehameha read a Representation from Z Bent & Mr. Wilkinson, about the Island Palmyra, requesting that the Island should be considered a Hawaiian possession & be placed under the Hawaiian Flag

" 'After some discussion it pleased the King to direct the Minister of the Interior, to grant what the Petitioners apply for, following the precedent of the Resolution regarding the Island Cornwallis & without exceeding the same.' "

The "precedent" referred to an expedition regarding a similar situation, the facts

concerning which will be related before continuing the chronology of Palmyra Island.

The precedent of the resolution regarding Cornwallis Island was: On May 24, 1858, one Adams submitted a letter to the Minister of Interior stating that he was desirous of taking possession of an island or islands in the North Pacific in the name of the Hawaiian Government, provided that the government would grant him certain rights. On May 31, 1858, Adams entered into a contract with the Minister of the Interior on behalf of the Hawaiian government, by which Adams was given "the exclusive right for five years of taking guano or any other produce which may be found on any Island or Islands in the North Pacific Ocean taken possession of, in the name of His Majesty King * * * by Samuel Clesson Allen in the Schooner 'Kalama'." There followed definite provisions respecting payment to the government, operation of the business by Adams and avoidance of the contract by default. A provision below the signatures was "that if it shall afterwards appear, that any Island or Islands which have been taken possession of by L. C. Allen in the name of H. Majesty * * * had been previously taken possession of by a foreign power—then, this contract shall be void, so far as relates to such Island or Islands". On the same day a commission was issued to Allen empowering him to take possession in the name of the King "any Island or Islands in the North Pacific which are not in the possession of any other Government, or any other people * * *".

On July 12, 1858, Allen reported that on June 14, 1858, he took possession of Cornwallis Island. The minutes of the Privy Council of July 27, 1858, disclose that the report was read, and a resolution adopted stating that the island was "to be considered as part of His Majesty's Domain".

The court below found that the contract with the Adams "was rescinded by the Minister of Interior, as to Cornwallis Island, shortly thereafter when it was discovered that that island had been annexed by the United States prior to the time when Allen arrived there on June 14, 1858", and that the "Minister of Interior, wrote to Adams on October 16, 1858, that the government was embarrassed when it learned that the Island Cornwallis (later known as Johnston Island) taken under Allen's commission, had already been annexed by the United States".

Returning to the Wilkinson and Bent chronology, we find that on the day following the passage of the resolution, a newspaper in Honolulu contained the following:

"The sloop Louisa has been purchased by J. Wilkinson, and is now being fitted for a southern expedition, under command of Captain Zenas Bent. We understand she will take possession of an island during her cruise * * *."

On March 1, 1862, the Minister of the Interior wrote Wilkinson and Bent in part as follows:

"* * * I am authorized to State on the part of his Majesty's government that they consent to the taking possession of the island Palmyra * * * for the purpose of increasing the trade and Commerce of this Kingdom, as well as offering protection to the interests of its subjects—

"I have the honor to forward with this dispatch the Authority * * * to take possession of the above mentioned island of Palmyra, and I beg to request that you will after having executed the orders contained in the Commission, you will report the fact to this Department * * *."

The commission referred to was dated the same day, signed by the King and the Minister of the Interior and authorized Bent "to take possession in our name of Palmyra Island * * * not having been taken possession of by any other government or any other people". It also contained directions as to the method of taking possession, as follows: "* * * by erecting thereon a short pole, with the Hawaiian flag wrapped around it and interring at the foot thereof a bottle well corked containing a paper signed by him in the following form, viz.: 'Visited and taken possession of by order of His Majesty King Kamehameha IV, for him and his successors on the Hawaiian throne, by the undersigned * * *' * * *."

A "Memoranda" published in the government gazette on June 14, 1862, stated that Captain Bent had sailed on March 28, 1862, and had arrived at Palmyra Island on April 6, 1862.

On June 16, 1862, Bent wrote the Minister of the Interior stating that he had taken "possession of Palmyra Island, in the name of His Majesty on April 15, 1862; that he left on the island one white man and four Hawaiians; that he planted some vegetables thereon; and that he proposed

to return to the island in about ten days. On June 18, 1862, the Minister of the Interior published a "Proclamation" in the gazette reciting that Captain Bent had taken possession of Palmyra Island on April 15, 1862, and "This is to give notice, that the said island, so taken possession of, is henceforth to be considered and respected as part of the Domain of the King of the Hawaiian Islands".

Bent conveyed all his "right, title and interest" in the island to Wilkinson on December 24, 1862. In 1885, Pacific Navigation Company, a Hawaiian corporation, became a successor in interest to Wilkinson after previous conveyances. Assessment for taxes was made against the corporation in 1885, 1886, 1887, the valuation of the island being fixed at $1,000. The corporation disposed of its interest in the island during the last named year, and no taxes were levied against the island until 1911.

Hawaii was a monarchy from 1795 to 1893 when the monarchy was abolished and after an intervening provisional government a republic was established. The joint resolution of Congress, approved July 7, 1898, 30 Stat. 750, recited that the Government of the Republic of Hawaii had consented "to cede absolutely and without reserve to the United States of America all rights of sovereignty of whatsoever kind in and over the Hawaiian Islands and their dependencies, and also to cede and transfer to the United States the absolute fee and ownership of all public, Government, or Crown lands * * * and all other public property of every kind and description belonging to the Government of the Hawaiian Islands * * *." It provided that the cession was accepted and that the Hawaiian Islands and their dependencies were "annexed as a part of the territory of the United States and are subject to the sovereign dominion thereof, and that all and singular the property and rights hereinbefore mentioned are vested in the United States of America". "Though the resolution was passed July 7, the formal transfer was not made until August 12, when, at noon of that day, the American flag was raised over the government house, and the islands ceded with appropriate ceremonies to a representative of the United States". Territory of Hawaii v. Mankichi, 190 U.S. 197, 209, 23 S.Ct. 787, 47 L.Ed. 1016.

The court below stated that appellant had asked it to take judicial notice of "U.S. Senate Document 16, 55th Congress, 3rd Session. Message of the President of the United States transmitting the Report of the Hawaiian Commission in pursuance of the Joint Resolution to provide for annexing the Hawaiian Islands to the United States"; that in such document an itemized inventory of all government property and lands and interests in lands; that Palmyra Island is not listed as government property, but is listed as a part of the Hawaiian group; and that the report contains the following:

"The Public Domain.—The statistics available in regard to the public lands belonging to the Republic of Hawaii at the time of the cession to the United States are not of that absolute or definite character that they can be accepted as conclusive of areas and values.

"The frequent radical changes in the past years in the methods of control and of sales and leases and transfers of lands under the direction of the Crown * * * have made it difficult to arrive at exact figures * * *."

The court below also stated that the evidence showed that "extensive and exhaustive search has been made to ascertain if Palmyra Island was ever publicly designated, classified, or known as Crown land or public domain, during or after the time of the Monarchy. Nothing of the kind can be found".

On February 11, 1905, the Attorney General of the Territory of Hawaii wrote the Governor of the Territory in answer to a request by the Governor for an opinion as to the jurisdiction of the Territory over the various small guano islands to the northwest of Kauai. In it the Attorney General stated: "Palmyra Island, seems to have been acquired during the reign of Kamehameha IV, by a proclamation signed by him, dated the 15th day of June, 1862". He further stated:

" * * * I believe that from these records the government's right to lease the islands, or any privileges thereon, is clear; also to lease the same, as suggested in your letter. The fact of making such leases, and the lessees taking possession thereunder, recognizing the Territory of Hawaii as the landlord would be prima facie evidence in international law of our right to the same and would be the best evidence the govern-

ment could make of its claim to the various islands in question".

In 1911, one Henry E. Cooper became the record owner of the island. In 1912, he filed a petition in the Land Court of the Territory, claiming ownership in fee simple, and praying for confirmation and registration of his title. The Territory, named as a respondent, by its Attorney General, filed a disclaimer of any interest in, to, or concerning the lands. On October 4, 1912, the Land Court made a decree declaring Cooper to be the owner in fee simple of the island. Assessments against the island for taxes have been made annually since 1911.

At the time of the decree a statute provided in part that the "laws of Hawaii relating to public lands * * * shall continue in force * * *". 48 U.S.C.A. § 664. Rev.Laws of Hawaii, 1905, § 2395, provided in part:

"A court is hereby established, to be called the court of land registration, which shall have exclusive original jurisdiction of all applications for the registration of title to land within the Territory, with power to hear and determine all questions arising upon such applications, and also have jurisdiction over such other questions as may come before it under this chapter, subject, however, to the right of appeal, as hereinafter provided. The proceedings upon such applications shall be proceedings in rem against the land, and the decrees shall operate directly on the land and vest and establish title thereto". *

Section 2431 provided in part: " * * * Every decree of registration of absolute title shall bind the land, and quiet the title thereto, subject only to the exceptions stated in the following section. It shall be conclusive upon and against all persons, including the Territory, whether mentioned by name in the application, notice or citation, or included in the general description 'to all whom it may concern.' * * *"

In 1922, Cooper conveyed a major portion of the island to Leslie and Ellen Fullard-Leo. On December 12, 1939, appellant filed in the court below an action to quiet title to Palmyra Island. The defendants named were Leslie and Ellen Fullard-Leo and the distributees of Cooper's estate. The petition alleged that the island became a part of the public or crown lands of the Kingdom of Hawaii on June 18, 1862; that the only interest in the island

granted anyone, was the exclusive right to take guano and other produce from the island for five years, which right was granted Wilkinson and Bent in 1862; that title to the lands passed to appellant by cession by the Republic of Hawaii; that the Land Court which made the decree above mentioned, was without jurisdiction to enter a decree because no conveyance from the Kingdom, the Provisional Government, or the Republic of Hawaii, or from appellant was shown; and that appellant was not a party to the proceedings. Jury trial was waived. The court below concluded that appellant had failed to establish its title, and dismissed the petition. This appeal followed.

■ Since the appellant alleged that it was the owner in fee simple of the island, it had the burden of establishing that ownership by a preponderance of the evidence. Appellant contends that it sustained that burden because: the island was proclaimed to be a part of the "domain" of the King, which meant absolute ownership; and that the King retained that absolute title, merely granting to Wilkinson and Bent the right to the produce from the island for five years. Appellees maintain that the proclamation that the island was a part of the "domain" of the King merely meant that it was under the "sovereignty" of the King and did not mean "ownership" in the King; that the "precedent" of Cornwallis Island meant only that Wilkinson and Bent could take possession of the island for the purpose of placing it under the sovereignty of the King only if it had not been taken possession of by any other government or people; and that in any event, the acquiescence by the governments of Hawaii in the private possession, and taxation of the island as private property, was sufficient to warrant a decision that the government of Hawaii parted with its title by a lost grant.

■ While it is possible, under principles of international law for two individuals to obtain title to such territory as they discover (see Johnson v. McIntosh, 8 Wheat. 543, 595, 21 U.S. 543, 595, 5 L.Ed. 681), such an occurrence is rare because title can also be obtained by conquest. 1 Hyde, International Law, 176 § 106. If the discovered land is important, many countries could and probably would acquire it by conquest, and the knowledge that such event might happen would deter most explorers. On the other hand, if the explorers take possession in behalf of a sover-

eignty, they are ordinarily able to salvage something of value from their effort with much less chance of losing it, depending, of course, on the strength of the sovereignty.

In the instant case, while the resolution of the Cabinet Council and the letter of March 1, 1862, addressed to Wilkinson and Bent by the Minister of Interior, may be equivocal on the point of ownership, there is nothing equivocal about the authority or commission issued to Bent. The commission makes it abundantly clear that Bent was merely acting as agent of the King. Under the principles of international law, the taking of possession by Bent perfected the title of the King. 1 Hyde, International Law, 167 § 100; 1 Oppenheim, International Law, 276–278, §§ 221–224; Martin v. Waddell, 16 Pet. 367, 409, 41 U.S. 367, 409, 10 L.Ed. 997. Nothing in the resolution or the letter referred to is contrary to that view.

Title being in the King, it passed to the United States by cession, unless it had been alienated by one of the Hawaiian governments. There is no proof of such alienation. Appellees contend, however, that possession by private individuals and taxation of the island are sufficient to warrant a decision that the alienation of the island was by a lost grant. By their answers appellees prayed that their title be quieted. The court below failed to grant that relief, and while discussion of the question was not made, the record seems conclusive against granting such relief. To sustain the claim, there must be "proof of an adverse, exclusive, and uninterrupted possession for twenty years". United States v. Chavez, 175 U.S. 509, 522, 20 S.Ct. 159, 163, 44 L.Ed. 255. While there was some evidence of possession, there is no proof that it was adverse, exclusive or uninterrupted within the meaning of the rule.

Appellees also contend we should affirm because the findings are actually an opinion, but we believe they are sufficient.

Reversed.

HEALY, Circuit Judge (dissenting).

The burden of proof was on the United States to establish its title and its right of possession.[1] The trial court was of opinion that the burden had not been discharged. It found that while the sovereignty of the United States was extended over Palmyra Island by the annexation of Hawaii, the prior government of that country "did not in fact or in form assert fee simple title to this land at the time of annexation, or at any other time"; and that "petitioner does not exhibit a title which can be sustained." The bill was accordingly dismissed.

I think the dismissal was proper. The finding was not clearly erroneous, or erroneous at all. The long continued possession of the appellees and their predecessors in interest, under claim and color of right, was presumptive evidence of title in themselves[2] which I believe the showing in the record failed to overcome. The proof leaves it wholly uncertain whether, upon the annexation of Palmyra in 1862, the Hawaiian Kingdom regarded title thereto as having vested in itself, as the United States now claims that it did; or whether, on the contrary, the kingdom considered the island to be the property of the two men who sought its annexation. This was the crucial point in the case; and the doubtful situation ought to be, as it was by the trial court, resolved against the party on whom rested the burden of proof.[3]

1. Although early discovered, Palmyra Island remained for more than half a century unclaimed by any sovereignty. It was uninhabited, but was very far from being a desolate place. The climate was propitious, and there was a safe anchorage for ships. Trees grew on the island of the species of coconut, puhala, and the koa. The soil was fertile and capable of producing a great variety of crops, such as corn, beans, and melons; and the island appears besides to have been valuable because of the prevalence there of biche de mer, a sea slug much prized by the Chinese in the preparation of soup.

There is contemporaneous evidence that for several years prior to 1862 Bent and Wilkinson had manifested an interest in the island, and that they were familiar with conditions there. In the Polynesian, pub-

[1] United States v. Pennsylvania & Erie Dock Co., 6 Cir., 272 F. 839, 842; United States v. Stinson, 197 U.S. 200, 205, 25 S.Ct. 426, 49 L.Ed. 724; Harrison v. Davis, 22 Haw. 465, 466; Kaluhiwa v. Miguel, 25 Haw. 246, 250.

[2] Bettman v. Harness, 42 W.Va. 433, 26 S.E. 271, 273, 36 L.R.A. 566; Llewellyn v. Cauffiel, 215 Pa. 23, 64 A. 388, 392; Powhatan Coal Co. v. Ritz, 60 W. Va. 395, 56 S.E. 257, 261, 9 L.R.A.,N.S., 1225; Swift v. Agnes, 33 Wis. 228.

[3] Smith v. Royal Insurance Co., 9 Cir., 125 F.2d 222, 224.

lished at Honolulu, there appears under date of June 14, 1862, an account of the recent visit of Bent to Palmyra in the Sloop Louisa, from which account this earlier familiarity appears and in which it is stated that Bent "has been over the same locality every few months during the last five years." It was not shown that there was anything in the locality to attract these frequent visits other than interest in the island itself.

There is later evidence in the record to like effect. In a letter written by Cooper[4] to Governor Frear in 1912 it was stated that "Captain Zenas Bent and J. Wilkinson settled on the Island sometime in the late 50's and made considerable improvements thereon." This letter was admitted in evidence without objection, and indeed on the insistence of the government. It is now attacked as self-serving. But Cooper's purpose in writing it, as is apparent from the context, was not to assert title in himself—a title which, incidentally, nobody was disputing—but to call the attention of the authorities to what the writer believed to be a threat of the extension of British sovereignty over the place.

Even stronger statements of a claimed right in Bent and Wilkinson antedating 1862 are contained in a letter of Governor Frear directed to the Secretary of the Interior at Washington. This letter, written in 1912, was likewise concerned with the supposed designs of the British. In it were enclosed copies of the documents relating to the events of 1862, which are in evidence here; and in the course of the communication Governor Frear stated that at the time of the annexation of the island Bent and Wilkinson were the "then-owners" of it. He further wrote that "the title to the Island both as to sovereignty and as to private ownership would seem to be American without question"; and that title "has been from a date several years before 1862 to the present time in citizens of Hawaii and one Hawaiian corporation, successively."

The majority opinion ignores the Polynesian account and fails to mention these letters. It seems clear to me that they afford some evidence of a title based on earlier acts of possession. Both Frear and Cooper had resided in the Islands for more than twenty years. Cooper had been

a circuit judge and secretary of the Territory. Frear was a lawyer of parts, having been made a circuit judge in the latter days of the Hawaiian Kingdom in 1893. In the same year he became a judge of the supreme court of that country, afterwards serving as chief justice. He was governor of the Territory from 1907 until 1913.[5]

It is argued that Governor Frear's statements merely parroted the assertion made in Cooper's letter; but we can not be sure of that. His statements are broader than those of Cooper, and he does not cite the Cooper letter as authority for them. It may be that his letter reflects his own interpretation of the documents in the Territorial archives. Too, it is possible that during the generation following the late 50's a tradition, now lost, was current in the Islands concerning this early occupancy, and that both men were familiar with it. In a situation such as the present, where the truth concerning ancient occurrences is obscured by time, the disappearance of documents, and the death of witnesses, declarations like these are entitled to a place in the general picture unless they are patently valueless or are refuted by the known facts.

The record contains, besides, internal evidence on the point. The "representation" of Bent and Wilkinson concerning Palmyra has been lost and we can not know definitely what was represented to the council. But it is undeniable that the two asserted some interest in themselves for which they desired the protection of the Hawaiian Kingdom. In the letter of the king's minister of March 1, 1862, acknowledging receipt of their petition and advising them of the granting of it, the minister states the object of the action taken in these words: "for the purpose of increasing the trade and commerce of this Kingdom *as well as offering protection to the interests of its subjects.*" [Emphasis supplied.] No private interests other than those of Bent and Wilkinson were concerned in the matter, and it was necessarily the interests of those subjects which were to be afforded protection by the extension of Hawaiian sovereignty.

Following the annexation these men informed the minister that they had planted crops, erected buildings, and were engaged in gathering and curing biche de mer. So

---

4 Cooper was the immediate grantor of appellees Fullard-Leo. He had acquired the island by purchase in 1911 and was one of the intermediate holders in the chain of title from Bent and Wilkinson.

5 The Americana, Volume 12, page 29.

far as appears, these activities, as well as their voyage to the island, were at their own expense; and there is nothing to show that they thought it essential to procure, or that they did in fact obtain, governmental permission for their occupancy or operations, or that they paid or became indebted for rentals or royalty. True, all this may be consistent with some sort of lessee relationship. But no lease appears; and the whole record is consistent with the recognition by the king of a proprietary right in the men themselves.

2. My associates appear largely to rest their holding on the wording of the commission issued to Bent and Wilkinson, which is said to be "unequivocal" on the point of ownership, and to make it "abundantly clear that Bent was merely acting as agent of the king."[6] The holding, or so it seems to me, puts a heavy strain on the language of this document. To be sure, Bent was deputized as agent of the king; but for what purpose?

Words are inexact tools at best. Had Bent carried in his pocket a royal grant of the island in fee simple, the language of the commission would not have seemed to him incongruous; nor would it to any one else. Like the wording of the later proclamation declaring that the island "is henceforth to be considered and respected as part of the Domain of the King of the Hawaiian Islands"[7]—a declaration of which much is made by the government—the language used is not inconsistent with the concurrent recognition of a private ownership.

The letter of the minister accompanying the commission, and which must be considered in pari materia with it, is evidence that there was such recognition. It states that the consent of the kingdom to the taking of possession of the island is in part for the purpose of "offering protection to the interests of its subjects," namely, Bent and Wilkinson. The most, I think, that can be said is that the language both of the commission and of the proclamation is equivocal, equally consistent with either theory. Certainly, its significance can not fairly be appraised apart from the setting in which these documents are found.

3. The resolution of the cabinet council to the effect that "it pleased the King to direct the Minister of the Interior, to grant what the petitioners apply for following the precedent of the resolution regarding the Island Cornwallis & without exceeding the same," is the chief item of proof on which the government rests its case, it being argued that Bent and Wilkinson obtained thereby only a five-year contract to exploit the island. The majority appear not to take much stock in the argument, and in this I think they are right.

Had the resolution referred to the precedent of the *contract* given to Adams, there would be substance in the government's contention. But the reference is to the precedent of the Cornwallis resolution, which makes no mention of a contract. The agreement of lease of Cornwallis Island was embodied in a separate instrument made at another time. There is nothing in the record from which one may infer that Bent or Wilkinson had knowledge of this contract, or that they were familiar with its terms.[8] In the Cornwallis matter it appears from his petition that Adams made no claim of proprietorship to any island, or indeed that he had any specific island in mind. He merely states that he "believes" he has information "of an island

---

6 For convenience, the language of the commission is here repeated: "To all whom it may concern greeting: Know ye, that we have authorized and empowered our faithful subject Zenas Bent and by these presents, do hereby empower the said Zenas Bent to take possession in our name of Palmyra Island * * *, not having been taken possession of by any other government or any other people, by erecting thereon a short pole, with the Hawaiian flag wrapped round it and interring at the foot thereof, a bottle well corked containing a paper signed by him in the following form, viz.: 'Visited and taken possession of by order of his majesty King Kamehameha IV, for him and his Successors on the Hawaiian throne, by the undersigned in the Schooner Louisa this —— day of 186—.'"

7 Webster defines "domain" as meaning an estate held in possession, or as "the territory over which dominion or authority is exerted; the possession of a sovereign or commonwealth, or the like."

8 Four years and four months after the granting of the petition of Bent and Wilkinson the latter made his will devising to his wife his interest in Palmyra. It is somewhat unlikely that Wilkinson would have been at pains to mention the island if he had no more than a license so soon to expire, and which would in any event expire before distribution could be had. Distribution did not in fact occur prior to June, 1867.

or islands in the north Pacific, on which are large deposits of guano."

It is fairly clear that the Cornwallis precedent was invoked as a limitation because of the embarrassment caused the kingdom by the circumstance, later developed, that Cornwallis Island had previously been taken possession of by the United States. I think the Cornwallis precedent is fully spelled out by the phrase "not having been taken possession of by any other government or any other people," inserted in the commission afterwards issued to Bent.

4. If Palmyra was claimed as public or crown land, one would expect to find some intimation thereof in the public acts of the government. It is of the utmost importance, therefore, to inquire whether there is any evidence of such claim. As said in the majority opinion, exhaustive research has failed to reveal that the island was ever designated or known as crown land or as public land during the days of the monarchy.

The crown lands of the kingdom, or the private lands of the king as they were earlier called, were constituted in 1848.[9] A complete list of those lands is to be found in Revised Laws of Hawaii 1925, Volume 2, pages 2152–2156. The original list was never added to. If the island was public land, the minister of the interior was authorized by law to sell or lease it, Civil Code 1859, § 42. There is no evidence of a lease or a sale of the island. Nor, as already noted, is there evidence of any payment of rent or royalty by Bent and Wilkinson, or by their successors, in whose occupancy the monarchy appears to have acquiesced through all its after existence.

On the other side there is affirmative evidence that the monarchy regarded the island as being private property. In the years 1885, 1886, and 1887 the kingdom entered it on the assessment roll as the real property of the Pacific Navigation Company, whose title had been placed of record, and collected taxes thereon. The old tax records of the kingdom appear to be incomplete, many of them being lost or missing, so that it can not be certainly known whether the island was thereafter assessed. In Territorial times, as has been seen, Governor Frear in an official letter recognized it to be private property. And in the years from 1911 to 1940 the Territory regularly assessed it for tax purposes.

Thus for the whole period of nearly eighty years neither the kingdom nor the republic, nor yet the United States, made any claim of title. On the contrary, by silent acquiescence and by public acts and declarations these successive governments recognized the proprietary claim of the private occupants. As late as 1938, so the record shows, the authorities of the United States, through the Navy Department, entered into negotiations with appellees for a lease of the land—negotiations which were proceeding amicably and satisfactorily to both parties when, for the first time, it appears to have occurred to somebody in the government service that ownership was in the United States. As to the presumptions governing in a situation like this, see Carino v. Insular Government of the P. I. 212 U.S. 449, 29 S.Ct. 334, 53 L.Ed. 594.

I have said there was never any claim of public ownership. The government argues the contrary, predicating its argument on a report of the attorney general of the Territory made to the governor in 1905. I would not notice this report were it not for the fact that the majority opinion quotes from it in such fashion as wholly to distort its meaning.

The report is copied in full on the margin.[10] It will be noted that the governor's

---

[9] The "Great Mahale" took place in 1845. At that time all individually occupied Hawaiian lands were held in feudal tenure. The Mahale substituted fee ownership. See Resolution of Oct. 26, 1846, 2 Hawaii, Kingdom Statutes, pp. 81–94. In 1848 the king transferred to the government most of his privately owned lands, those so transferred being thereafter held and disposed of as public lands.

[10] "In answer to your request of December 15th, 1904, for an opinion as to the jurisdiction of the Territory of Hawaii over the various small guano islands to the north-west of Kauai. I would reply as follows:

"After a careful investigation of the records in the office of the Secretary of the Territory, formerly the Foreign Office, and from other sources of information, I find that the authority of the Territory of Hawaii over these islands is as follows:

"It appears in the report of J. A. King, Minister of the Interior, dated the 2nd day of June, 1894, to Sanford B. Dole, President of the Republic of Hawaii, that formal possession was taken of Necker Island by the said J. A. King, represent-

request for an opinion relates to "the various small guano islands to the northwest of Kauai." Kauai is one of the Hawaiian chain. Palmyra lies a thousand miles to the south of Kauai, so that it is not one of the islands on which an opinion was asked. Moreover, it is confessedly not a guano island. A glance at the map reveals that all the other islands mentioned in the report lie northwest of Kauai. The reference to Palmyra appears to be an inadvertence. The attorney general's statement of his belief "that from these records the government's right to lease the islands, or any privileges thereon, is clear," is expressly predicated on the precedent of the actual leases which his researches had disclosed. From a reading of the opinion as a whole, it is abundantly clear that, as regards Palmyra, the report not only fails to lend color to the government's contention but is adverse to it.

5. It is unrealistic, I think, to attempt an appraisal of the legal implications of the annexation of Palmyra according to the usages of the law of nations. Until Cook's discovery in 1778 the Hawaiian archipelago was totally isolated from the world, its very existence being unknown. Thereafter until comparatively recent decades the contacts of its people with the older civilizations were casual and intermittent. The first known compilation of the laws of the kingdom appeared in 1842; and in the later jurisprudence of the country the common and the civil law were sources of information, but they were without authority.[11]

As stated by the trial court it is not known that the kingdom had any law or fixed policy relating to the annexation of distant islands, or in respect of title to lands embraced in those annexed. And the judge justly commented on the unfettered authority of the king to prescribe the terms under which annexation should be made. In consenting to extend his dominion over Palmyra he possessed undoubted power to assent to any claim of right or ownership which might have been represented by these two subjects of his who petitioned for the island's annexation.

6. The trial court, content to rest its decision on the government's lack of proof, appears not to have considered the bearing on the case of the 1912 decree of the Hawaiian Land Court.[12] Counsel, too, have not given the attention to the judgment in the land court proceeding to which I think it may be entitled. That court, having before it the identical questions of law, as well

ing the Republic of Hawaii, on May 22, 1894; it also appears by that report that the government of the Hawaiian Islands had sent Captain John Paty to take possession of said island about 1857; it also appears that he did take such possession at that time.

"Palmyra Island, seems to have been acquired during the reign of Kamehameha IV, by a proclamation signed by him, dated the 15th day of June, 1862.

"Lisiansky Island was taken by the government of the Hawaiian Islands through Capt. John Paty on the 10th day of May, 1857.

"Morell Island and Patrocinio or Byer Island were both taken for the Republic of Hawaii in 1898, by G. N. Wilcox, a Commissioner for that purpose appointed.

"While I was unable to find any official records of the acquisition of the other islands, the government has, for many years, assumed jurisdiction over them. The following leases have been made, from time to time, and have been undisputed:

"Lease of Necker Island, dated the 2nd day of June, 1904, to A. H. C. Lovekin, at $25.00 per annum, term twenty-five years.

"Lease of J. A. King, Minister of the Interior, to the North Pacific Phosphate & Fertilizer Co. of Morell, Ocean, Pearl and Hermes reef, Midway and French Frigate Shoals, twenty-five years from the 15th day of February, 1894.

"Laysan and Lisiansky Islands to G. D. Freeth, April 17th, 1893.

"While it is to be regretted that the records of our foreign office are not more complete, possibly a more exhaustive search might find other documents which, in the present state of the old foreign office, it was impossible for me to find. I believe that from these records the government's right to lease the islands, or any privileges thereon, is clear; also to lease the same, as suggested in your letter. The fact of making such leases, and the lessees taking possession thereunder, recognizing the Territory of Hawaii as the landlord would be prima facie evidence in international law of our right to the same and would be the best evidence the government could make of its claim to the various islands in question."

[11] Waialua Co. v. Christian, 305 U.S. 91, 107, 59 S.Ct. 21, 83 L.Ed. 60.

[12] Concerning the jurisdiction and power of the Land Court, see In re Rosenbledt, 24 Haw. 298, 307.

as of fact, presented here, adjudged title to the island to be in Cooper in fee simple.

The Territory of Hawaii had been made a party to the proceeding. It submitted to the jurisdiction, an appearance was entered on its behalf, and a disclaimer filed. The bearing of the Territory's disclaimer on the present suit by the United States is unclear. While the public and crown lands of Hawaii were ceded to the United States at the time of the annexation in 1898, nevertheless, with exceptions not here pertinent, these lands have always been held for the benefit of the people of the Territory, and they have remained "in the possession, use, and control" of the Territorial government, to be "maintained, managed, and cared for by it * * * until * * * taken for the uses and purposes of the United States by direction of the President or of the governor of Hawaii." See § 91 Organic Act, 48 U.S.C. A. § 511; Land Title, Kalena, 34 Haw. 93, 98. Consult further 48 U.S.C.A. §§ 661 to 677. The United States has not heretofore been in the possession or occupancy of Palmyra, nor has it heretofore claimed the island by withdrawal or otherwise. That the Territory, in formally disclaiming any interest in Palmyra, was acting advisedly in the full consciousness of its rights and responsibilities in the premises, can not, I think, be doubted.[13]

In other situations, the Territory appears to have had recourse to its land court for the registration and confirmation of title to public lands where adverse claims had been asserted by private parties. See In re Title of Kioloku, 25 Haw. 357. There the Territory had petitioned the land court for confirmation of its title to a tract asserted to be public land. The court denied the petition and adjudged the title to be in the private claimant; and the supreme court affirmed the judgment on the appeal by the Territory. Was the United States thereafter free to take the land under the reserved power of the President contained in § 91 of the Organic Act, despite this solemn judgment adverse to the claim of the Territory? If so, the consequences to the security of Hawaiian titles are grave indeed. Compare Land Title, Kalena, supra. But if the judgment in the Kioloku case was conclusive of the proposition that the land involved was not public land, then the judgment in Cooper's case likewise concluded the question, unless it was obtained by fraud; and no fraud is charged. These problems which I have suggested are not merely questions lurking in the record; a consideration of them is vital to a decision if the finding of the trial court on the facts is not to be accepted.

If it be thought that the United States is in nowise concluded by judgments relating to unwithdrawn public lands in suits to which the Territory was a party, it does not follow, I think, that the judgment in the Cooper proceeding is thereby stripped of all authority. That judgment must be taken as a decision that the proof before the land court was as a matter of local law sufficient to establish fee title in Cooper. The same proof is presented here.

It was said in Waialua Co. v. Christian, 305 U.S. 91, 109, 59 S.Ct. 21, 30, 83 L.Ed. 60, that "while the 34th section of the Judiciary Act is not applicable to territories, the arguments of policy in favor of having the state courts declare the law of the state are applicable to the question of whether or not territorial courts should declare the law of the territories with the least possible interference". It was thought that while the power was present to reverse any ruling of the territorial court, on law or fact, the power should be exercised only in cases of manifest error. The court was speaking immediately of decisions of the territorial supreme court; but under later developments of the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, I cannot but believe the principle applies with equal force to decisions of the inferior territorial courts. No territorial decision at variance with the determination of the land court in Cooper's case has been called to our attention. Moreover, that determination has support in the holding in In re Title of Kioloku, supra, in which case on analogous facts the court indulged the presumption of a lost grant.

[13] Section 73 of the Organic Act, 48 U.S.C.A. § 664, continued in force the laws of Hawaii relating to public lands, the settlement of boundaries, etc. See 24 Op.Atty.Gen. 600.