UNITED STATES v. ONE HUNDRED AND THIRTY–TWO PACKAGES OF SPIRITUOUS LIQUORS et al.

(District Court, E. D. Missouri, E. D.    February 12. 1895.)

REMOVING LIQUORS UNDER FALSE BRANDS—REV. ST. § 3449.

A compounder or rectifier of liquors, who labels his products as those of a well-known distiller and rectifier, and attempts to place them on the market under such brands, removing them for that purpose from his warehouse to another place, does not thereby subject his liquors to forfeiture and himself to fine, under Rev. St. § 3449, which provides that, whenever any person ships or removes any liquors under any other than the proper name or brand, known to the trade as designating the kind and quality of the contents of the package, he shall forfeit the liquors, and be subject to fine.

William H. Clopton, U. S. Atty.
Chester H. Krum, for claimants.

PRIEST, District Judge.    This is a proceeding to condemn 132 packages of various kinds of spirituous liquors and wines, under the provisions of section 3449, Rev. St. U. S.    The general averment of the information is that the Western Distilling Company did "unlawfully transport and remove, and cause to be transported and removed, said packages of spirituous liquors and wines from the building numbered 201 North Main street, in said city [St. Louis], to the building numbered 407 South Main street, in said city, under the names and brands other than the proper names and brands known to the trade as designating the kind and quality of the contents of said packages containing the same; that is to say, fifteen of said

packages were wrongfully and unlawfully marked and branded as containing 'J. & F. Martel Cognac,' that being a name and brand known to the trade as designating a certain kind and quality of spirituous liquors and brandy, when in fact none of said packages contained any J. & F. Martel Cognac, but contained a spurious imitation therof." The information then alleges that 39 of said packages were marked "Booth & Company, London Superior Old Tom Gin"; whereas none of them contained any of that make of gin, but a spurious imitation thereof. These are sufficient to illustrate the theory of the information, the charge with respect to the other of the 132 packages being of the same tenor. The evidence tends to prove that the packages proceeded against are bottles of liquor put up in cases, and in that form sold and shipped to the retail dealers. It appears that J. & F. Martel Cognac is a foreign brandy, made by J. & F. Martel, and is among dealers regarded as a superior quality of brandy. The like observation may be made of Booth & Co.'s London Superior Old Tom Gin. The evidence shows that the liquors proceeded against bore the imitation brands or labels of "J. & F. Martel Cognac," and "Booth & Company, London Old Tom Gin," respectively, and were inferior in quality of excellence to that of the foreign makers, and were compounded at the rectifying house of the Western Distilling Company, at 201 North Main street, and, after being cased, were drayed from there to the depot of the St. Louis Drayage Company, for the purpose of being shipped thence to purchasers.

The naked question presented in this case is whether when a compounder or rectifier labels his product as that of a well-known distiller or rectifier, and attempts to place them under such brands upon the market, he subjects his liquors to forfeiture, and himself to fine, under the provisions of section 3449, Rev. St. U. S. The government urges an affirmative answer to this proposition, and justifies this insistence by reference to the very comprehensive language of the section. The section reads as follows:

"Whenever any person ships, transports, or removes any spirituous or fermented liquors or wines, under any other than the proper name or brand known to the trade as designating the kind and quality of the contents of the casks or packages containing the same, or causes such act to be done, he shall forfeit said liquors or wines, and casks or packages, and be subject to pay a fine of five hundred dollars."

As this section stands in the Revised Statutes, it is difficult to understand what it means by the terms "proper name or brand known to the trade as designating the kind and quality of the contents of the casks or packages containing the same." It seems to me that if we are to construe this law without reference to its history or the relation to the text of which it formed a part when first enacted, and the signification it then had, we must exclude two ideas which its literal reading might suggest, viz. that of protecting trade-marks or undue advantage in trade, and a credulous and indulging public from the imposition of a bad imitation of good liquor. And we are impelled to this conclusion by those sound rules of construction which direct us to consider the object aimed at

by the legislature and the jurisdiction of the legislative body. Congress had no authority to legislate upon the subject of trade-marks, or make regulations for the suppression of unfair advantages in trade, or to protect the public against the imposition of a base quality of merchandise. These subjects are not germane to internal revenue taxation on liquors; and it is highly improbable that any such thought occurred in connection with the formulation of a set of rules and regulations for imposing and collecting this tax. Congress aimed to derive a revenue from distilled or fermented spirits, and so surround this industry with penal regulations as to insure, as far as possible, the collection of the tax upon all liquors so produced. It had no other object in view. It is not pretended here that the liquors proceeded against have, in any manner or to any extent, escaped any tax to which they are subject, or that by this practice they could do so. If these packages are forfeited to the government, it will not be because it sustained any loss or has in any wise been defrauded, but solely because they are counterfeits of the brands of other manufacturers,—because of a personal fraud upon other makers, whom the government has in no wise undertaken to protect or could legitimately engage to secure. Such a construction is inadmissible. The words "proper name or brand known to the trade as designating the kind and quality," etc., must mean something else than a trade-mark or make of a certain distiller. We find a very appropriate signification for them in the internal revenue law, and in the regulations and usages of the officers in the administration of that law. In the manual issued by the commissioner, and approved by the secretary of the treasury (May, 1890), the gauger, in marking, branding, and stamping casks or packages of distilled spirits, is directed (page 123) to "mark or brand with a die, stencil, or branding iron on the head of the cask, in letters not less than one inch in length, the particular name of the spirits known to the trade, which mark or brand will be varied to suit whatever kind is contained in the package, as "High wines," "Rye," and "Bourbon," or "Copper distilled," "Whiskies," as the case may be. These are the classifications which are referred to in the section we have under consideration. "Kind" does not refer to the maker, or "quality" to the excellence of his goods. These statutes are born to outlive the most extended life of any distiller, and the standard of excellency of a product of any distiller is too varying and indefinite a standard for the measurement of punishment and forfeiture. "Kind," in the statute, means a well-known classification of spirituous and fermented liquors, and "quality" may be a synonym or refer to the standard of proof. A statute dealing with this same subject, and which we are not entitled to ignore, gives the negative to the contention on the part of the government. By the act of 1863 (15 Stat. 151, § 59), compounders of liquors were required to pay a special tax of $25, and were defined to be a "person who, without rectifying, purifying or refining distilled spirits, shall, by mixing such spirits, wine, or other liquor with any materials, manufacture any spurious, imitation, or compound liquors, for sale under the name of whisky, brandy, gin, rum, wine, spirits, cordials, or wine bitters,

or any other name, shall be regarded as a compounder of liquors." Thus, it appears that the very vice for which the government seeks here to condemn these liquors is authorized and licensed by it. Such an absurd construction cannot obtain.    By the act of 1879 (20 Stat. 327) compounders are made rectifiers, and taxed as such. A like argument may be drawn from section 3328, Rev. St. U. S. But the true construction of section 3449 is made more apparent when we refer to its relation at the time it came into existence. We will there discover its design and the mischief it was intended to avert.    Section 3449 first appeared as a proviso to section 29 of the act of 1866 (14 Stat. 155, 156); and whatever signification it then bore it must still retain, because no other meaning has been imparted to it by subsequent enactment.    Bowen v. Railroad Co., 118 Mo. 541, 24 S. W. 436.    The general rule of interpretation is that a proviso must be construed with reference to the subject-matter of the section of which it forms a part, unless there is a manifest legislative intention that it should limit the operation of other sections of the act.    Callaway v. Harding, 23 Grat. 542–547; Dollar Sav. Bank v. U. S., 19 Wall. 227.    The office of a proviso is to restrain, modify, or interpret the enacting clause.    Wayman v. Southard, 10 Wheat. 30; Pearce v. Bank, 33 Ala. 693–702; Spring v. Collector, 78 Ill. 101–105. Where a proviso is meaningless with respect to the enacting clause, or was not intended to restrain, modify, or interpret it, some courts have altogether rejected it as a nullity.    Mullins v. Treasurer, 5 Q. B. Div. 170.    Ihmsen v. Navigation Co., 32 Pa. St. 153.    We must approach the consideration of section 29 of the act of 1866 with these canons of construction in mind.    Section 29 provides, that each distillery shall have its individual inspector, and requires him to take an account of all the substances used for the production of spirits, and to inspect all the spirits distilled, and to take charge of the bonded warehouse established for the distillery, to take joint custody with the owner of the warehouse, and to take from the owner, when the spirits are placed in the warehouse, a subscribed entry therefor, in such form as may be prescribed, and to indorse upon the same his certificate, and transmit these to the collector of the district.    The other provisions relate to his fees and the appointment of his deputy.    There are two provisos to this section, the second or last of which is the one we are considering.    The first punishes, by fine, the removal of any of the materials used in making spirits or the distilled product, in the absence of the inspector or his assistant, and without the permission of the collector. Then follows the proviso against the removal or shipment under a name other than that generally known to the trade as designating the kind of spirits.    Construed with reference to its context and as having a similar though broader operation than the first proviso, it must apply to some removal from the distillery or warehouse under an improper or misleading title.    It would be an offense under this statute to remove whisky from a distillery to the warehouse in casks under the name of brandy or the reverse, for by this means there would be opportunities for defrauding the government.    Without attempting to define with precision the operative scope of this pro-

viso, or to determine whether, in view of the subsequent action of congress, it is any longer in force, we must hold that it only operates under some such circumstances as we have indicated. It is sufficient in this case to say that it cannot be tortured in its meaning so as to apply to the facts which are shown in this case. The peremptory instruction asked by the claimant must be given, and a judgment in accordance therewith entered.