**UNITED STATES v. FULLARD–LEO et al.**

No. 10912.

Circuit Court of Appeals, Ninth Circuit.

May 23, 1946.

Writ of Certiorari Granted Oct. 14, 1946.
See 67 S.Ct. 100.

DENMAN and BONE, Circuit Judges, dissenting.

———◆———

J. Edward Williams, Acting Head, Lands Div., Dept. of Justice, and Roger P. Marquis, Atty., Dept. of Justice, both of Washington, D. C., for appellant.

A. G. M. Robertson, of Honolulu, Hawaii (Robertson, Castle & Anthony, of Honolulu, Hawaii, of counsel), for appellees 'Leslie Fullard-Leo and Ellen Fullard-Leo.

E. H. Beebe, of Honolulu, Hawaii (Smith, Wild, Beebe & Cades, of Honolulu, Hawaii, of counsel), for appellees Mary Ellen Cooper and others.

Before GARRECHT, DENMAN, MATHEWS, STEPHENS, HEALY, BONE, and ORR, Circuit Judges.

HEALY, Circuit Judge...

This suit was brought by the United States in the federal court for Hawaii to quiet title to Palmyra Island. The case has been twice tried, and the present appeal marks its second appearance in this court. Originally the District Court entered a judgment of dismissal because of insufficiency of the proof to exhibit title in the United States. This court reversed, United States v. Fullard-Leo, 9 Cir., 133 F.2d 743; and on remand the defendants (appellees)

were permitted to amend their answers and a second trial was had,[1] the outcome of which was a judgment quieting title in the defendants. From this judgment the government appeals. Because of the novelty and importance of some of the questions presented and the division of opinion among the judges when the case was here before, it was this time ordered heard before the court sitting en banc.

The parties stipulated below that the evidence taken on the first trial should be considered on the second. Some additional evidence was introduced, relating for the most part to specific acts of occupancy and efforts to develop the resources of the Island by appellees and their predecessors in interest over scattered intervals of time from 1885 to the late 1930's. This evidence tends to amplify the original showing of actual possession and claim of ownership during the period mentioned. The bulk of the evidence bearing upon the contested issue of title was developed on the original trial; and since the factual background of the case was fully discussed in the majority and dissenting opinions of this court on the first appeal we shall not undertake again to go over that ground. Hence the discussion which follows must be read in light of the former opinions.

On the basis of the record before it the District Court presumed that a grant, now lost, issued to Bent and Wilkinson by which the Hawaiian monarchy parted with its title to the Island. The court further determined that the Land Court had jurisdiction to entertain Cooper's petition to register his title; and that the disclaimer filed by the Territory in the Cooper proceeding was valid and binding not only on it but upon the United States, as was the decree entered by the Land Court in that proceeding. In effect, the decision was that the government failed to sustain its claim of title; that appellees have presumptive title; and that in any event the decree of the Land Court was conclusive of the matter.

Notwithstanding our decision on the former appeal we have authority, if we choose to exercise it, to re-examine the several aspects of the case. "In the absence of statute the phrase, 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power," Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152. Cf., also, Cochran v. M & M Transp. Co., 1 Cir., 110 F.2d 519, 521; Electrical Research Products v. Gross, 9 Cir., 120 F.2d 301, 308. While the power to re-examine questions previously determined should be sparingly exercised, there are occasions when justice requires that course. We think this is one of those occasions. The view of the case expressed in the minority opinion on the former appeal appears to the court as presently constituted to be the just view and it is thought that it should prevail.

1. The facts are reminiscent of those involved in Carino v. Insular Government of the Philippine Islands, 212 U.S. 449, 29 S.Ct. 334, 336, 53 L.Ed. 594, and they demand a like method of approach. That case was a proceeding on the application of a private claimant for the registration of title to a tract of land in the Philippines. The United States, having taken possession of the property for military purposes, opposed the application. The applicant and his predecessors had been in possession, according to the custom of the country, for more than fifty years and had been recognized as owners by the Igorots. No document of title, however, had issued from the Spanish Crown. It was in substance the contention of the government, and appears to have been the holding of the Philippine courts to which the cause was appealed, that Spain had title to all the land in the Philippines except so far as it saw fit to permit the acquisition of private titles; that there was no prescription against the Crown; and since the United States had

---

[1] The United States petitioned this court for a writ prohibiting the retrial and commanding entry of a judgment for the government. The petition was denied, In re Petition of United States, 9 Cir., 142 F.2d 465.

succeeded to the Spanish title, of necessity the land was the property of the government.

Notwithstanding the apparent logic of this position the Supreme Court reversed the judgment against the applicant. It observed that the acquisition of the Philippines by America was not for the purpose of acquiring the lands occupied by the inhabitants, but, to the contrary, the Organic Act, 32 Stat. 691, expressly declared that property rights were to be administered for the benefit of the inhabitants. It thought that whatever the law might be upon the various points urged by the United States, "every presumption is and ought to be against the Government in a case like the present." The benefit of doubts and ambiguities, it was said, ought, as a matter of justice, be given the applicant.

As regards Hawaii in like manner, despoilment was not the aim of annexation. It was the purpose of Congress, as expressed in the Organic Act, to leave the ceded public lands in the control of the Territory to be administered by it for the benefit of its people. There is in this benign program no proper place for advantaging the United States at the expense of the inhabitants on grounds which, though having the semblance of legality, affront the sense of justice. Nothing occurs to us to be more at war with the policy than the assertion of title by the United States, in doubtful cases, to land long occupied by local inhabitants in good faith under claim of right, more particularly in instances where the occupancy and claim originated long prior to annexation and were acquiesced in by the then Hawaiian government. In such a situation the occupant is entitled to the benefit of every presumption and to have all doubts resolved in his favor.

2. In its former opinion this court held inadmissible the presumption of a grant in favor of the private occupants, observing

that "while there was some evidence of [their] possession, there is no proof that it was adverse, exclusive or uninterrupted" [133 F.2d 747] within the rule relating to the presumption of lost grants. The statement, we think, fails to take adequate account of the record. It is undisputed that the latter fifty years of the occupancy, from 1885 on, was adverse; and while the evidence touching the earlier period is scanty and inconclusive nevertheless the inference may fairly be drawn from it that the occupancy was adverse from the beginning. That the possession was exclusive and uninterrupted is evidenced by the fact that it was never intruded upon or disturbed by any other claimant, governmental or private.[2] It is notable that this consistent recognition by government of the rightfulness of the ancient possession finally culminated in a formal disclaimer of title by the Territory.

The presumption of a lost grant is not necessarily restricted to situations in which a court or jury may believe there actually was a grant. Grants are often presumed for the mere purpose and from a principle of quieting possession. Fletcher v. Fuller, 120 U.S. 534, 7 S.Ct. 667, 30 L. Ed. 759; United States v. Chavez, 175 U. S. 509, 20 S.Ct. 159, 44 L.Ed. 255. In the present case, however, as will more fully appear from the discussion in the dissenting opinion on the first appeal, 133 F.2d 748, 749, there is evidence from which one may reasonably conclude that there was a grant of an informal nature from the monarchy to Bent and Wilkinson, that is to say, an express acquiescence in a claim of possessory title put forward by the two men who brought about the annexation of the Island. Their petition or "representation" concerning Palmyra has been lost and we can not know the purport of it. It may well be that if its contents were known a reading of it in conjunction with the resolution and other official action ta-

---

[2] The trial court found that "the island of Palmyra is situated about a thousand miles from the main islands of the Hawaiian group. Its owner could not be expected to reside there. The island could not be reached except by sea-going craft. It is a unit in and of itself and its identity is well known. The successive possessions have been maintained under color of title, adversely to the true owner, assuming that there was one, and without interruption by any paramount claim."

ken upon the granting of it would spell out a concession or recognition of ownership tantamount to a grant in fee simple.

■ The local decisions support the view that a lost grant may here be presumed. Consult In re Title of Kioloku, 25 Haw. 357, where, on analogous facts, the court indulged the presumption as against a claim of title put forward by the Territory. And in the Cooper proceeding the Land Court, on the identical facts now before us, entered a decree confirming Cooper's title. While no opinion was written in the case, presumably the decree was predicated on the presumption of a lost grant.[3] In the absence of manifest error the federal courts are obliged to follow these local decisions. Cf. Waialua Agricultural Co. v. Christian, 305 U.S. 91, 109, 59 S.Ct. 21, 30, 83 L.Ed. 60.

■ 3. The decisions on the original trial and appeal gave no consideration to the effect of the decree of the Hawaiian Land Court confirming the title of appellees' grantor, Cooper, and this aspect of the case was largely ignored in the briefs of counsel. Certain views on that subject were, however, tentatively put forward under point 6 of the minority opinion on the appeal, 133 F.2d 751, 752. The more thorough briefing of which we now have the advantage tends to confirm the view, there expressed, that the decree should be taken as conclusive upon the United States. Accordingly, the court adopts as its own the tentative conclusion reached by the dissenting judge.

Good sense, as well as considerations having to do with the security of titles in Hawaii, dictates this result. Had the President or Governor, by executive proclamation issued prior to the initiation of the Land Court proceeding, taken the land from the Territory, as might have been done pursuant to § 91 of the Organic Act, 48 U.S.C.A. § 511, it is clear that the United States would have been a necessary party; and in its absence jurisdiction to proceed would have been lacking. Such was the posture of affairs confronting the

court in Land Title, Kalena, 34 Haw. 93, 98. There the United States, prior to the initiation of the registration proceeding, had taken the land pursuant to the provisions of the Organic Act, and on the court's attention being called to that fact it was held that jurisdiction was lacking. The obverse of the situation is illustrated in Re Title of Kioloku, 25 Haw. 357, where there had been no withdrawal of the land. In that action jurisdiction was exercised and the petition of the Territory for the registration and confirmation of title to land claimed to be public was rejected in favor of adverse claims asserted by private parties.

■ Some further observations on the point may be helpful. Under the land registration laws of the Territory, embraced in Chapter 154, Revised Laws of Hawaii 1905, a decree of registration of absolute title binds the land and quiets the title thereto. The decree is conclusive upon the world, including the Territory, § 2431; In re Rosenbledt, 24 Haw. 298, 307. If it appears that the public may have a claim adverse to that of the applicant for registration, special notice of the application, in addition to the published notice provided for, is required to be served on the territorial attorney general, § 2425. Accordingly there can be no doubt that the Territory was properly made a party to the Cooper application and that the attorney general was authorized to appear on its behalf.

It is essential in this connection again to emphasize the position occupied by the Territory in relation to the public lands. If the land involved in the Cooper application was public property, full authority in respect of its management, administration and disposition had been committed to the Territory by Congress by the terms of §§ 91 and 73 of the Organic Act, 48 U.S.C.A. §§ 511, 663-677, and along with the authority went the duty of asserting and maintaining the true state of the title if, indeed, it were thought to rest in the public. Hence the Territory, in disclaiming any

[3] If the court finds that the applicant for an absolute title has not title proper for such registration, a decree dismissing the application is required to be entered, § 2430 Revised Laws of Hawaii, 1905; In re Rosenbledt, 24 Haw. 298, 307.

interest, was functioning in its capacity as trustee of the public lands, of which, essentially, it was the beneficial owner.[4] And as was observed on the first appeal (133 F.2d 752), it has been the practice of the Territory to resort to the Land Court for the registration or confirmation of title to public lands where adverse claims thereto are asserted.

The territorial laws providing for the registration of titles were enacted in 1903 and have since remained in effect. Congress did not see fit to interpose objections to any of their provisions, hence we must assume that it was content with their enactment.

It is of further significance that conveyances of public lands, made pursuant to the administrative power conferred on the Territory by the Organic Act, are admittedly not conveyances of the United States, executed by the territorial officers as agents; on the contrary, patents and other conveyances are issued by the Territory in all cases under its own name and in its own right. It would seem, from the general setup, that the authority of the Territory to participate in proceedings for the registration of title is a mere incident of the general power of administration conferred by Congress upon the Territory.

The judgment is affirmed.

Dissent of DENMAN, Circuit Judge, in which Judge BONE concurs.

We dissent from the court's decision. The title is in the United States because

(1) The claim of title of the United States to Palmyra Island was not disclaimed in the Hawaiian Land Court proceeding. The Territory disclaimed only the Territory's "interest" in the island. The territorial interest is limited to possession and use. It never had a title to the island to disclaim. The question of its power, as agent of the United States to sell the lands, to disclaim its principal's title, is not before us.

(2) The Territory has no power to confer jurisdiction in the Land Court to de-termine the title of the United States, much less to disclaim it. The case of Land Title, Kalena, 34 Haw. 93, expressly so holds.

(3) The doctrine of Erie Railway v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, does not apply to state or territorial decisions on any federal law, particularly to the law governing the sovereign's ownership of its land.

(4) A decision for the United States will in no way cloud the title to Hawaiian lands.

(5) (a) The uncontradicted evidence affirmatively shows that the inference of a lost grant to Bent and Wilkinson is not warranted. (b) Deciding otherwise is a menace to the public domain of the United States.

(6) (a) All the evidence negatives a fee simple title in the island in Bent and Wilkinson. (b) The deed of Bent and the will of Wilkinson do not even purport to convey a fee or any title to the island.

The United States filed its petition in the United States District Court for Hawaii to quiet title to and for a writ of possession in the Island of Palmyra in the Pacific Ocean, some thousand miles from the main group of the Hawaiian Islands. The appellees answered and, relying upon a decree of the Hawaiian Land Court rendered in 1912 determining the title to be and registering it in their predecessor in interest, prayed judgment "settling and quieting title to said Palmyra * * * in these respondents and determining and declaring that said decree of the Land Court of the Territory of Hawaii was and is a binding decree."

At the trial the United States showed the acquisition of the title to Palmyra as crown lands of Kamehameha by his annexation on April 15, 1862, the transfer of title to the Republic of Hawaii and its further transfer to the United States by the action of the Republic on the annexation of the Hawaiian Islands as a Territory of the United States on August 7,

---

4 Under the terms of § 73 of the Organic Act, all funds arising from the disposition of public lands are appropriat-ed to the uses and purposes of the Territory.

1898, when the Republic ceded to the United States "the absolute fee and ownership of all public government or crown lands."

The United States further proved that the pertinent records of the Kingdom, the Republic and the United States showed no patent or other conveyance transferring Palmyra to anyone.

To sustain their burden of going forward with the evidence to meet such a prima facie case appellees offered (a) the decree of the Hawaiian Land Court and (b) evidence which they claim shows the continuing possession warranting the inference of a lost deed to perfect appellees' title.

The District Court held that the Land Court had acquired jurisdiction for a decree determining title as against the United States, though the latter had not appeared before that court or consented to be sued, by virtue of a disclaimer of the *Territory's interest* in the lands filed by the Territory in that proceeding.[1] The District Court further held that apart from the purported res judicata effect of the Land Court decree, the evidence showed the continuous possession in the appellees and their predecessors in interest which warrants the inference that there was a lost royal patent to the lands giving a fee title to appellees' predecessors in interest. The District Court decreed that the fee simple title was vested in respondents and that "said title is hereby settled and quieted in them as against all claims and demands of said petitioner, the United States of America." The United States appeals.[2]

(1) *The claim of title of the United States to Palmyra Island was not disclaimed in the Hawaiian Land Court proceeding.*

It is argued here that the *United States* was divested of its claim of ownership of Palmyra Island by the action of the territorial attorney general in appearing and filing a disclaimer of such *federal* ownership in the Land Court proceeding brought by Cooper, appellees' predecessor in interest.

We dissent from the acceptance by this court of this contention. The text shows the contrary. The Territory filed an answer in which it disclaimed not the *title* of the *United States* but only the "interest" of the *Territory of Hawaii*. The whole answer reads

"Answer of the Territory of Hawaii
Disclaiming Interest

Comes now the Territory of Hawaii by L. P. Scott, Deputy Attorney General, and for answer to the Petition of the above named Henry P. Cooper, says that the Territory of Hawaii disclaims any interest in, to or concerning the lands and premises as described and set forth in said Petition.

Dated at Honolulu, this 1st day of July, A.D. 1912.

Territory of Hawaii
By L. P. Scott
Deputy Attorney General."

The Territory of Hawaii is vested with no title whatsoever in the public lands ceded to the United States in 1898 by the Republic of Hawaii.

The interest which it disclaimed is no more than the right of their possession, use and control, the Organic Act in Sec. 91, as amended, 48 U.S.C.A. § 511, providing that the United States lands in Hawaii "shall be and remain in the possession, use and control of the government of the Territory of Hawaii."

Hence, the Territory having no title, it had none to disclaim. On the face of the document on which the contrary contention rests, its error is shown. Even assuming the Territory has the power to disclaim

---

[1] There was a further holding that the United States was estopped because the petitioner was a bona fide purchaser from his predecessor, which does not merit our consideration.

[2] The decree appealed from was rendered at a second trial, 66 F.Supp. 782. On an appeal here from a decree on a prior trial that the United States take nothing by its petition, the District Court was reversed, one judge dissenting. Further evidence was adduced at the second trial. This court ordered the case heard en banc and, disregarding our decision in Sorensen v. Pyrate Corporation, 9 Cir., 65 F. 982, respecting the law of the case, considered *de novo* the contentions of the parties.

the interest in the title of the United States, the record here shows this was not done.

(2) *The Territory has no power to confer jurisdiction in the Land Court to determine the title of the United States, much less to disclaim it. The case of Land Title, Kalena, 34 Haw. 93, expressly so holds.*

Assuming the Territory had disclaimed the title of the United States, we dissent from this court's holding that the District Court did not err in holding that such territorial power to disclaim or to defend the title of the United States to its public lands is sustained by the decision of the Hawaiian Supreme Court in Land Title, Kalena, 34 Haw. 93. That case *on its face* holds the exact contrary.

There the Territory appeared in the Land Court in the kind of "trustee" capacity for the United States contended here as the Territory's function. That is, if we properly interpret the extraordinary statement of this court's opinion, that the Territory is *at the same time* both trustee and beneficiary of the public domain of the United States in the Islands, the statement being "Hence the Territory, in disclaiming any interest, was functioning in its capacity as trustee of the public lands, of which, essentially, it was the beneficial owner." What is extraordinary in this statement is the fact that it ignores the fact that the title is to the public lands of the United States with full power to withdraw it from any disposition by the Territory.

Assuming, however, that it was in the claimed exercise of such a new kind of trusteeship, the Territory appeared in the Kalena case and filed its answer in which it asserted title in the United States in 228 acres of land claimed in private ownership. The Land Court decreed the land to belong to the United States. This is stated in the Kalena opinion at page 94 of 34 Haw., as follows: "The Territory of Hawaii filed its answer claiming that 228 acres of land sought to be registered by the applicant belonged to the United States of America in fee simple to which the Territory of Hawaii was entitled to the use, control, management and the power of disposition in fee simple. No other appearance was made. After a hearing on the application the land court awarded to the applicant only 254 acres of the land claimed by him and decreed that the remaining 228 acres were public lands, and therefore refused to register the same in the applicant. From that decision the applicant appealed to the circuit court sitting with a jury as prescribed by statute."

On the appeal to the Hawaiian Circuit Court, the United States appeared and rejected the contention that the Territory was authorized to appear as its trustee in defense of its title. Its rejection is the more significant because the decree placed the title in the United States. Its purpose was to refute the contention that the Land Court "decree is conclusive upon the world" as previously held In re Rosenbledt, 24 Haw. 298, 307.

Instead of supporting an affirmance, the United States sought *dismissal* of the suit as to the lands decreed to it on the ground that, though the so-called territorial trustee appeared to defend the United States title, the Land Court acquired no jurisdiction to determine an adverse claim to its title to the public lands. This appears in the following from page 95 of 34 Haw.: "Comes now the United States of America, By I. M. Stainback, United States Attorney in and for the District of Hawaii, and appearing specially for this Motion and for no other purpose, moves this Court for an Order dismissing the petition and appeal to a jury upon the following ground: That this Court is without jurisdiction to entertain a suit against the United States or against the property of the United States or determine title to property in possession of the United States and claimed by it. * * *"

The Kalena opinion then proceeds for nineteen pages to consider the Supreme Court and other federal cases, in all over 15 cases, holding that if the "title" to land of the United States is involved all courts are without jurisdiction to consider it unless the United States appears and consents to be sued. The Hawaiian Supreme Court in sustaining the dismissal of the Circuit Court, at page 102 of 34 Haw., states the law

"If this court were to overrule the decision of the circuit court granting the motion to dismiss and reinstate the cause below the suit would be one to settle the title to the lands not only against the world in general *but primarily against the United States.* We are not here intimating or deciding that a decree of the land court or the circuit court sitting with a jury or of this court in affirming the action of either of the inferior tribunals would estop the United States in any future action. *We merely decide that since the title of the United States to the lands must necessarily and directly be affected by such a decree the land court proceedings constitute in substance a suit against the United States and property claimed, occupied and possessed by it."* (Emphasis supplied.)

The italicized *actual holding* of the Hawaiian Supreme Court is not mentioned, much less quoted in the opinion of this court. The proceeding was *dismissed* by the Hawaiian Supreme Court as to the public lands because it merely "affected" the government's interest, although the Land Court *decreed* title in the United States.

The Kalena opinion thus clearly refutes the contention that the Supreme Court of Hawaii has held that the Territory could bind the United States in the instant litigation by appearing and in the capacity of trustee of the title of the United States disavow any interest therein in the United States.

We think the Hawaiian Supreme Court correctly states the law. The only power the Territory has over its sovereign's public lands is that connected with their "possession, use, and control" cited above. Its control was confined to their "management and disposition." Their "disposition" was narrowly confined to sales for specified public works (§ 91, 48 U.S.C.A. § 511) and sales for homestead purposes, etc. (§ 73, 48 U.S.C.A. §§ 663-677).

There is also the specific limiting of the power of disposition (48 U.S.C.A. § 673) in that "No sale of lands for other than homestead purposes except as provided in this section and no exchange by which the Territory shall convey lands, exceeding over forty acres in area or $5,000 in value shall be made." There is no provision authorizing the Territory to accomplish a conveyance of the property of the United States by means of a disclaimer in a Land Court proceeding involving land owned by the United States. These relevant Acts of Congress have specifically denied any such authority and have strictly limited the methods by which such lands can be conveyed. The contrary holding of the District Court that the United States is bound by the Land Court decree is plainly erroneous.

In Shevlin-Mathieu Lumber Co. v. Fogarty, 130 Minn. 456, 153 N.W. 871, a title had been registered under the Torrens system and the land had been purchased in reliance upon the certificate of title. When it later appeared that the purported title was invalid because no patent had been issued by the United States, the court held that the purchaser was entitled to reimbursement from the Torrens assurance fund. The court stated, at page 459 of 130 Minn., at page 873 of 153 N.W.

"As the state courts have no jurisdiction over the proprietary title of the United States, an attempt to register land while the United States still retains its original title thereto is a mere nullity."

And again the court said, at page 461 of 130 Minn., at page 873 of 153 N.W.,

"It is not within the power of the state to bar the rights of the United States and the registration proceedings do not purport to bar such rights."

The Hawaiian Land Court likewise lacks power to affect the title of the United States.

The United States cannot, of course, be sued without its consent. It is equally elementary that, whether or not it is named as a party, a suit against property in which the United States has an interest is a suit against the United States. United States v. Alabama, 313 U.S. 274, 282, 61 S.Ct. 1011, 85 L.Ed. 1327; Minnesota v. United States, 305 U.S. 382, 386, 59 S.Ct. 292, 83 L.Ed. 235; Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191; Stanley v.

Schwalby, 162 U.S. 255, 272, 16 S.Ct. 754, 40 L.Ed. 960. Whether the United States is made a formal party or not makes no difference. If the governmental interest is called to the attention of the court, the suit will be dismissed. Cunningham v. Macon & Brunswick R. Co., 109 U.S. 446, 457, 3 S.Ct. 292, 609, 27 L.Ed. 992; Hagood v. Southern, 117 U.S. 52, 67-69, 6 S.Ct. 608, 29 L.Ed. 805; Belknap v. Schild, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599; Oregon v. Hitchcock, 202 U.S. 60, 69, 70, 26 S.Ct. 568, 50 L.Ed. 935; Naganab v. Hitchcock, 202 U.S. 473, 475, 476, 26 S.Ct. 667, 50 L.Ed. 1113; Louisiana v. Garfield, 211 U.S. 70, 77, 78, 29 S.Ct. 31, 53 L.Ed. 92; Goldberg v. Daniels, 231 U.S. 218, 221, 222, 34 S.Ct. 84, 58 L.Ed. 191; New Mexico v. Lane, 243 U.S. 52, 58, 37 S.Ct. 348, 61 L.Ed. 588.

(3) *The doctrine of Erie Railway v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487, does not apply to state or territorial decisions on any federal law, particularly to the law governing the sovereign's ownership of its land.*

Nor can we agree with the discussion of Erie Railway v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, in the earlier dissenting opinion of 133 F. 2d at page 752, and adopted in the opinion of this court, as applicable to *federal* law. Even a casual examination of the Erie Railway case shows its principles are confined to the decisions of *state* courts in construing *state* laws. The annexation is a *federal* act placing the title to the island in the federal sovereign. The limited power of the Territory is created in a federal statute. The use of the island for a defense in a global war is a national and not a mere local question.

Similarly with the case of Waialua Agricultural Co. v. Christian, 305 U.S. 91, 109, 59 S.Ct. 21, 83 L.Ed. 60. The question there was one of purely territorial law. No question of federal title to land was involved. As stated in the opinion, at page 93 of 305 U.S., at page 23 of 59 S.Ct., 83 L.Ed. 60, "These cases concern the validity of a lease, a contract for maintenance and a deed, conveying or assigning rights of Eliza R. P. Christian, an incompetent, to a one-third undivided interest in land on the Island of Oahu, Territory of Hawaii."

However, in the Kalena opinion the Hawaiian Supreme Court properly states the law that the Land Court has no jurisdiction over the United States and in that respect overrules the statement of In re Rosenbledt, supra, that the Land Court decree is conclusive against the world.

(4) *A decision for the United States will in no way cloud the title to Hawaiian lands.*

It is contended that it will cause a cloud upon all Hawaiian titles if this small island, unoccupied by anyone for over 74 of the 77-odd years since its acquisition by King Kamehameha, does not have its fee title found in Bent and Wilkinson by the application of the presumption of a lost grant.

As later discussed, continued possession by apparent fee simple owners is the essential basis of the lost grant theory. Where such possession exists, the inference of the lost grant protects the possessing inhabitants.

For over 75 years every available acre of the inhabited Hawaiian Islands has been occupied by such claimants either in agriculture, grazing, or for homes. Judicial notice well may be taken that for that period no area now in the territory of the United States has been more completely exploited of its resources. Since United States v. Chaves, 159 U.S. 452, 16 S.Ct. 57, 40 L.Ed. 215; Carino v. Insular Government, 212 U.S. 449, 29 S.Ct. 334, 53 L.Ed. 594, and Territory of Hawaii v. Hutchinson, 9 Cir., 272 F. 856, considered infra, no one would be foolish enough to claim that the predecessors in interest with continuous possession over many decades in the apparent ownership of such lands held no title from the sovereign.

(5) (a) *The uncontradicted evidence affirmatively shows that no inference of a lost grant is warranted.*

United States v. Chaves, 159 U.S. 452, 16 S.Ct. 57, 40 L.Ed. 215, is the leading case establishing the lost grant theory. There the actual issuance of the grant is found by the United States Court of Land Claims on a petition alleging its issue. There was

continued occupancy of the lands from 1883 to 1892. The important relevant finding of that court, appearing at page 456 of 159 U.S., at page 59 of 16 S.Ct., 40 L.Ed. 215, is "that the said complainants are in the possession of the said land embraced within the calls of the said grant, and claim the same; that they and their ancestors and predecessors in right have been in the possession of the same since the issuance of the grant by the Mexican government, and that complainants have such a claim and interest in the land as gives them a right to apply to the court for a confirmation of their title * * *."

The essence of the evidence to support the theory is that the claimants to the land *are in possession* of the land and that their predecessors in right *have been in possession* of the same *since the issuance of the grant* of the fee by the Mexican Government. Similarly in Carino v. Insular Government, 212 U.S. 449, 455, 456, 29 S.Ct. 334, 335, 53 L.Ed. 594, "The applicant and plaintiff in error is an Igorot of the province of Benguet, where the land lies. For

more that fifty years before the Treaty of Paris, April 11, 1899 * * *, as far back as the findings go, the plaintiff and his ancestors had held the land as owners."

In this court in Territory of Hawaii v. Hutchinson, 9 Cir., 272 F. 856, 858, the land in question had been "in actual, open, continuous, and adverse possession" of the claimants from 1870 to the date of the litigation in 1921. This was on appeal from the case of In re Title of Kioloku, 25 Haw. 357, cited by appellees without mentioning the finding of continuous adverse possession. In the Hawaiian case the finding of such possession began in 1861.

The evidence in the instant case is to the exact contrary. In the 77 years from the royal proclamation of taking in 1862 to the filing of the instant case in 1939, the occupancy of the island has been less than two and one-half years. Of this a year was in the years 1885–86 and a year in 1920. In the interim, from 1862 to 1939, there was no one residing there under a claim of possession—the occasional visitors' brief stays being for other purposes.[3]

---

3 Zenas Bent visited the island in April, 1862, and left five men there (R. 74, 75). In June annexation was formally proclaimed (R. 83). It does not appear how long the five men remained on the island but in December of the same year Bent transferred all his interest to Wilkinson (R. 122). Wilkinson died in 1866 and his will was probated in New Zealand giving his rights in Palmyra to his wife, Kalama (R. 125, 151; U. S. Exhibit DD original). Nothing further occurred until 1885 when the supposed title was transferred to the Pacific Navigation Company, a conveyance being executed by two of Kalama's heirs and Bent's deed being acknowledged, 23 years after its execution (R. 123). Thus, except for the five men left on the island by Bent in order to make the annexation effective, there is no indication that there was any possession or even visits to the island for the 23 years following annexation. On the contrary, the fact that Bent's deed was not acknowledged until 1885, after conveyance by Kalama's heirs, clearly indicates that, in the meantime, no claim of title or possession was asserted by anyone.

Employees of the Pacific Navigation Company occupied the island for approximately a year in 1885 and 1886 (R. 408–411) and the company paid taxes

in 1885, 1886 and 1887 (R. 307), not to the United States but to the Territory. (The claimant placed the lands on the tax rolls and in many cases taxes were paid on public lands, R. 307, 308). This company's project apparently failed and there followed another long period when the island was vacant. Sometime between 1889 and 1897 a British vessel visited the island and finding it uninhabited, claimed it for that country (R. 203; see sheet 6 of Exhibit 23 for identification in United States Exhibit CC original). In 1912 at the instigation of Henry Cooper who had just acquired the supposed title and whose Land Court proceeding to register it was pending, a vessel of the United States Navy visited the island in order to confirm this country's claim to it (R. 194–197, 199–204, 206–208, 413–417). No occupants were found on the island (R. 416). In 1913 and 1914 Cooper made short visits of two or three weeks to the island and built a house thereon (R. 368–370, 371, 372). However, the island was not permanently occupied and in 1914 evidence was found that since the 1913 visit Japanese bird poachers had been there (R. 373).

In 1920 another attempt was made to commercially develop the island. It was leased by Cooper; a corporation, The Island of Palmyra Copra Company, was

We hence dissent from the holding of this court that there has been an occupancy and possession for 50 years, as stated in its opinion in the following extraordinary statement: "It is *undisputed* that the latter fifty years of the *occupancy,* from 1885 on, *was adverse;* and while the evidence touching the earlier period is scanty and inconclusive nevertheless the inference may fairly be drawn from it that the *occupancy* was adverse *from the beginning.* That the *possession* was exclusive and *uninterrupted* is evidenced by the fact that it was never intruded upon or disturbed by any other claimant, governmental or private." (Emphasis supplied.)

This statement is subject to the following *reductio ad absurdum* (a) There is a presumption of a lost grant from Kamehameha in 1862 to Bent and Wilkinson, hence since that time the title has always been in them. Therefore the island has been constructively in the possession of them and their successors during the 74 years of its vacancy. (b) Since the claimants so out of actual possession for 74 years have had the constructive possession of the island since 1862, we must presume a lost grant to Bent and Wilkinson made in 1862.

That is to say, "the lost grant proves the possession and the possession proves the lost grant." The sovereign may not be deprived of a portion of its domain by a contention which requires such raising of oneself by one's bootstraps. The possession in Chaves v. United States, Carino v. Insular Government, and Territory of Hawaii v. Hutchinson, supra, relied upon in this court's opinion, is long continued *actual* possession.

No case is cited in the District Court's opinion or in the appellee's briefs applying the lost grant inference to any situation less than one of uninterrupted and long continuing possession of a kind indicating the ownership of the fee.

Certain taxes were paid the tenant territory during the period. The Territory is the tenant, not the owner of the land. No case holds that the payment of taxes to the tenant is evidence of a lost deed to the taxpayer from the landlord, here the United States. Since occupancy by persons claiming and acting as owners is the sole criterion, such tax paying by admittedly absentee claimants is no proof of such occupancy.

To continue with the extraordinary contention of this court's opinion, it is asserted that the Chaves, Carino, and Hutchinson cases become applicable because the court below found "the island of Palmyra is situated about a thousand miles from the main island of the Hawaiian group. Its owner could not be expected *to reside* there."

That is to say, if the land in the Carino case were an island a thousand miles from the main Philippine archipelago, and Carino's Igorot tribe resided there but three years in the middle of a period of 50 years and during the remaining 47 years had resided on one of the main islands, continuous possession and therefore a lost deed to the Igorot tribe must be presumed!

Likewise, if the Chaves family in New

---

organized; and a "settlement group" was sent to the island (R. 375–378, 380–386). This project was not successful and its activities terminated after about a year (R. 379). The Fullard-Leos bought Cooper's rights in 1922 but only visited the island twice, once in 1924 for twelve days and again in 1935 for one day (R. 388, 401). Between 1922 and the time this suit was commenced, no one lived on the island. It was most frequently visited by United States Navy or Coast Guard vessels which were in the neighborhood (R. 373, 374, 386, 394–398, 399, 433, 436, 439, 440). In fact, Fullard-Leo went on the Coast Guard vessel "Itasca" when he visited the island in 1935 (R.

399, 401). Occasionally, vacationists or scientists made short visits to the island (R. 391–393, 404–406, 419–426, 431, 432). During this period an unnamed man lived there for two or three months (R. 402). On another occasion (1936) a party from Tahiti went there in an attempt to find a cargo of button shells which were rumored to have been jettisoned by an unseaworthy boat (R. 427–430). By 1938, the house which Cooper built in 1913 had collapsed and all the various visitors testified they did not see any evidence of occupation in recent times (R. 448, 374, 386, 416, 421, 432, 434, 437, 441, 448).

Mexico were claiming a lost patent to Catalina Island, less than a thousand miles westward, and resided there but three years in the middle of a period of 59 years from 1833 to 1892 and the remaining 57 years resided in New Mexico, continuous residence there of the Chaves family and a lost patent to them must be presumed because the distance to Catalina is so great and the island then was economically valueless!

(5) (b) *The acceptance of the lost grant theory establishes a precedent menacing to the public domain of the United States.*

There should be considered the application of the lost grant theory to the federal public domain in, say, the State of California. In 1862 a man has a license from the United States to fish and hunt in a great mountain meadow, like Tuolumne Meadows. He and his employees are there for several months in 1862, staying in a log cabin they built there. A quitclaim to the meadow from the occupant to a third party, not to the meadow but to his property *"on"* the meadow, made by the first occupant is filed in the State Recorder's office of Tuolumne County and at the request of the occupant placed upon the tax rolls for three years by a state official and the taxes paid the state. Thereafter for 28 years, no one goes there but the occasional mountain hiker. Then in 1885 there is an occupancy for a year by one claiming title under the quitclaim deed. Again, for 35 years, the meadow is vacant save for an occasional vacationer. Then, in 1920, there is a second occupancy for a year by one claiming title under the same quitclaim deed. Then there is another period of vacancy save for the occasional visitor for nineteen years. The United States then begins a suit in the United States District Court for the Northern District of California to quiet its title, it being admitted that, as with Palmyra Island, there has been no order withdrawing the meadow from the public domain.

The District Court, if controlled by the contention of the appellees and the minority in the former appeal, *must* deny the sovereign's title! Such illustrations of the evil arising from establishing such a precedent may be multiplied indefinitely.

(6) (a) *All the evidence negatives a fee simple title in Bent and Wilkinson.*

It cannot be contended that the act of occupation of the island by Bent, for the King, was as of his prior owned property. He made prior visits to the island but how long he stayed does not appear. No possession as *owner* is shown, much less continuous possession. Bent was not the discoverer, for the island was visited long before he went there.

When he went there in 1862, Bent was an agent of King Kamehameha exercising his duty, shown in his proclamation on the taking of Palmyra, "Visited and taken possession of by order of His Majesty King Kamehameha IV, for him and his successors on the Hawaiian throne, by the undersigned." The "undersigned" was Zenas Bent.

Stress is laid by this court's opinion upon the words of the letter from the Minister of the Interior commissioning Bent to take possession of Palmyra Island "for the purpose of increasing the trade and commerce of the Kingdom as well as offering protection to the interests of its subjects."

The pertinent words are "interests in *its subjects*," not of the applicants Bent and Wilkinson. However, assuming that they were not for the protection of all the King's subjects by the acquisition of further territory and its non-acquisition by a hostile power, it is again raising oneself by one's bootstraps to say that the "interests" of these two men were of a fee simple to the whole island. *What* the interests were is the very question in issue. All the contemporary evidence discussed above and hereafter is that their interest was not a fee simple interest. The taking of the island was for Kamehameha, "him and his successors."

*The lost application theory.* We know of no authority supporting a contention that the lost patent doctrine applies to sustain the claim that Bent's lost application, called a "representation," was for a royal patent to the fee simple absolute of the entire island of Palmyra and that the rep-

resentation was followed by such a patent or that the granting of the representation constituted such a patent.

Assuming such an absurdity, the only evidence of the content of the application is in the resolution of the King's Cabinet Council on February 26, 1862, stating

"P. Kamehameha read a Representation from Z. Bent & Mr. Wilkinson, about the Island of Palmyra, requesting that the Island should be considered a Hawaiian possession & be placed under the Hawaiian flag.

"After some discussion it pleased the King to direct the Minister of the Interior, to grant what the Petitioners apply for, following the precedent of the Resolution regarding the Island Cornwallis & *without exceeding the same.*" (Emphasis supplied.)

Since nothing concerning the title to the whole island can *exceed* a royal patent of a fee simple title, the words of the Council's resolution "without *exceeding* the same" negative an inference that what was applied for and granted was such title to the island.

The "precedent of the Resolution regarding the Island Cornwallis" accentuates this negation of the granting of a fee simple patent to the island. The Cornwallis Island resolution of date July 27, 1858, is a confirmation of the taking of possession on June 14, 1858, of that island in the name of the King by one Adams. That taking of possession was pursuant to a letter of May 24, 1858, from Adams to the Hawaiian Minister of the Interior asking for *"certain rights"* in the island, not the fee simple title inclusive of *all* rights, as compensation for the service as the King's agent in such taking of possession. On May 31, 1858, before sailing to accomplish this mission, Adams and the Minister of the Interior entered into a contract by which Adams was given "the exclusive right for five years of taking guano or any *other produce* which may be found on any Island or Islands in the North Pacific Ocean taken possession of, in the name of His Majesty King * * * by Samuel Clesson Allen in the Schooner 'Kalama.' "

Thus we have not only no evidence that Bent's lost "representation" to the King sought a royal grant as a fee simple to Palmyra Island, but evidence from which the only inference that may be drawn is that the most that was given him was "not exceeding" a lease for five years to take "guano or any other produce" from the island.

The formal taking of possession for the King was on April 15. Bent, in a letter of June 16, 1862, (after his return to Honolulu) to the Minister of the Interior, states that in that month's time he had built a house and begun to gather on the island's shores beche de mer, the trepang to be dried and exported to China for the making of soup. Bent had planted some vegetables and the five men he left on the island were then engaged in gathering more of the trepang.

This was the "produce" of the island of the Cornwallis resolution. The manifest of his vessel on his return to Honolulu before June 16 showed "biche le mer" in her cargo.

No act of thus gathering the "produce" of Palmyra Island or otherwise at any time is shown to be adverse to the King's fee simple to the island or to be the ownership of the fee title to the island by transfer from the King. No possible inference of such fee ownership by Bent can be made in the six months to December 24, 1862, when Bent, in dissolving his partnership with Wilkinson, executed the quitclaim of his property "on" the island of Wilkinson. What produce of beche de mer was then situated "on" the island does not appear, though it is a fair inference that his men were as successful in gathering them after June 15, when his vessel brought them in its cargo from the prior month's effort.

(6) (b) *The deed of Bent and the will of Wilkinson do not even purport to convey a fee or any title to the island.*

So far as concerns appellees' alleged paper title to Palmyra Island, it is claimed to begin in the quitclaim of December 24, 1862, of Zenas Bent to Johnson Wilkinson, in which no title or interest in the island itself is asserted or purported to be transferred. An examination of the instrument shows the contrary. Instead of attempting

to transfer the quitclaimer's interest in the island as a whole, it transferred no more than his "right, title and interest in and to all the *property* of whatever description now lying or situated *on* Palmyra Island. (Emphasis supplied.)

This quitclaim was made within nine months of the proclamation of Kamehameha IV taking possession in his, the King's, name of the island—a taking for the King accomplished by Bent on April 15, 1862. It is no evidence to support the claim that the granted lost application was for the ownership of the island. One does not describe his fee simple title to an entire island by limiting his transfer to property "lying on" or "situated on" the island.

This absurdity is heightened by the recital in the deed in the very sentence of the quitclaim of Bent's property interests "situated on" the island, that the island itself, instead of belonging to Bent, "at present belongs to the Hawaiian Kingdom."

The next step in the alleged paper title is in 1866 in Wilkinson's will in which he devised to his wife certain personal property and "all my landed freehold and *leasehold* Estates in the Province of Auckland aforesaid, at Honolulu in the Sandwich Islands in the Island of Palmyra in the South Sea Islands and wheresoever the same may be situated and whether in the said Colony of New Zealand or elsewhere To hold such real and *personal* estate unto the said Kalama absolutely and forever." (Emphasis supplied.)

Here is no evidence that the estate in Palmyra Island was more than the leasehold for five years to take the "produce" of the island which in 1866, when Wilkinson made his will, still had a year to expire and quite likely might be extended. Wilkinson was Bent's partner and knew all the facts when, in winding up the partnership on December 24, 1862, he accepted Bent's quitclaim to no more than Bent's interest in the property "now lying or situated on" the island, instead of a deed for Bent's half of a fee in the island as an entirety. There is nothing from which it can be inferred that Wilkinson willed anything "exceeding" the leasehold interest in the taking of the island's produce.

Like the lost grant theory, the theory of lost application for a grant in fee is negatived by all the facts in the record. The United States has established its title to Palmyra Island and the District Court erred in holding the contrary.

The decision of the District Court should be reversed.